IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
January 23, 2001 Session

## STATE OF TENNESSEE v. LEE ROY GASS

**Direct Appeal from the Criminal Court for Hamblen County**
**No. 99-CR-240    James E. Beckner, Judge**

_____

**No. E2000-00810-CCA-R3-CD**
**July 3, 2001**
_____

The appellant, Lee Roy Gass, was convicted by a jury in the Hamblen County Criminal Court of one count of aggravated rape, one count of burglary, and one count of official misconduct. The trial court sentenced the appellant as a Range I violent offender to twenty-two years incarceration in the Tennessee Department of Correction for the aggravated rape conviction and as a Range I standard offender to four years incarceration in the Department for the burglary conviction and to two years incarceration for the official misconduct conviction. The trial court ordered concurrent service of the appellant's sentences, resulting in an effective sentence of twenty-two years incarceration. In this appeal, the appellant presents the following issues for our review: (1) whether the evidence adduced at trial is sufficient to support his convictions; (2) whether the trial court erred in sustaining the State's objection to testimony by a defense witness concerning the victim's neighbor, Patricia Costner; (3) whether newly discovered evidence warrants the reversal of the appellant's convictions and the remand of this case for a new trial; and (4) whether the trial court erred in sentencing the appellant. Following a review of the record and the parties' briefs, we affirm the judgments of the trial court in the aggravated rape and burglary cases and affirm as modified the judgment in the official misconduct case.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed in Part and Affirmed as Modified in Part.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and JOSEPH M. TIPTON, J., joined.

Scott A. Hodge, Morristown, Tennessee, for the appellant, Lee Roy Gass.

Paul G. Summers, Attorney General and Reporter; Peter M. Coughlan, Assistant Attorney General; H. Greeley Wells, Jr., District Attorney General Pro Tempore; Gene Perrin, Assistant District Attorney General; and Jim Goodwin, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

## I. Factual Background

On November 1, 1999, a Hamblen County Grand Jury returned a presentment charging the appellant with one count of aggravated rape while armed with a weapon, one count of burglary, and one count of official misconduct. The indictments arose from the fifty-two-year-old appellant's rape of eighteen-year-old SAH[1] while the appellant was on duty as a constable in Hamblen County. The appellant's case proceeded to trial on March 8, 2000.

At trial, SAH testified on behalf of the State. She recounted that, between midnight and 1:00 a.m. on July 10, 1999, she was walking along Morristown Boulevard in Morristown, Tennessee. She explained to the jury that she suffered from insomnia and, therefore, frequently walked along the boulevard late at night. On the night in question, however, she noticed a green Jeep Cherokee that appeared to be following her. She became frightened and began to run.

As she attempted to elude the Jeep Cherokee, SAH observed another vehicle drive into the parking lot of a Sherwin-Williams store. Although unmarked, the vehicle "resembled a cop car." Accordingly, SAH approached the vehicle. As she approached the vehicle, she observed that a round, blue light was affixed to the vehicle's dashboard, and the appellant was seated inside dressed in a uniform. Specifically, SAH recalled that the appellant "was dressed in county clothes, like a county officer; had a name tag like they usually have, badges, you know, guns - - gun, pepper spray, the whole works." She noted that she had never seen the appellant before that night.

SAH told the appellant about the Jeep Cherokee that had been following her. In turn, the appellant invited her to "ride around" with him. SAH agreed to accompany the appellant because she "thought it was okay." During the ensuing drive, the appellant purchased a Mellow Yellow for SAH from a vending machine. He then drove a short distance outside of town to the ReMax Realty office building on West Andrew Johnson Highway and parked his vehicle in a parking lot located at the rear of the building. The appellant explained to SAH that the sheriff's department maintained an office inside the building, and the appellant needed to use the telephone.

The appellant and SAH entered the building through a rear door. According to SAH, the appellant appeared to use a key to unlock the door. Once inside the building, the appellant used the telephone, and SAH sat at a nearby desk and waited. After the appellant completed his telephone call, he and SAH began talking. The topic of conversation soon turned to "sexual things," and the appellant asked SAH if she had ever engaged in sexual intercourse. When she replied that she had not, the appellant "started talking about different ways you could do it and that - - and different positions and stuff like that." When SAH became upset and "was about to cry or something," the appellant approached her, placed his arm around her, and began "kissing [her] and junk." SAH asked the appellant to stop, pushing him away from her. The appellant complied and indicated that he wanted to go outside and smoke a cigarette. Accordingly, the two left the building.

---

[1]It is the policy of the author of this opinion to refer to all victims of sexual offenses by their initials.

Once outside, however, the appellant began "rubbing . . . on [SAH's] breasts and down in the vaginal area." Additionally, he pulled up her shirt and "started sucking on [her breasts]." SAH repeatedly told the appellant to stop. After her third request, the appellant again complied, and they went back inside the office building.

Inside the building, the appellant and SAH talked for a while, and, at some point, the appellant received a radio call from a dispatcher or another officer requesting his assistance in transporting a patient to Peninsula Hospital, a mental health treatment facility. The appellant responded that he was busy and, soon thereafter, renewed his sexual advances toward SAH by kissing her. When SAH asked the appellant to stop, he instead removed his pants and his gun belt. The appellant placed the gun belt on a desk within "arm's reach" and recommenced kissing SAH, also instructing her to remove her shorts. SAH testified that she initially refused, but "[the appellant] kind of raised his voice and he told me that I better do it." She recalled that she was frightened and complied with the appellant's order, whereupon the appellant engaged in sexual intercourse with her. SAH repeatedly stated to the appellant, "I don't want to do this, stop, . . . please stop, . . . I don't want to do this." The appellant merely reassured her that he would not "come in [her] or get [her] pregnant." SAH could not recall at trial whether or not the appellant ever ejaculated during intercourse.

In addition to engaging in intercourse with SAH, the appellant also ordered her to "jack him off" or masturbate him. When she refused, he again "yelled" at her and she capitulated to his demand. Afterwards, the appellant left the building, leaving SAH inside. SAH recounted, "I was just - - I felt so nasty - - I just went ahead and cleaned myself up. You, know, there was some paper towels on the desk, so I used those to wipe myself off." She threw the paper towels and a "panty liner" into a trash can where she had earlier deposited her Mello Yello can.

When SAH finished cleaning and dressing herself, the appellant suggested that they return to Morristown. SAH agreed, explaining at trial that she had no other means of returning to town. In Morristown, the appellant and SAH encountered several additional officers who invited the appellant to accompany them to breakfast. The appellant evidently refused, and the officers soon departed. The appellant then drove SAH to a building that housed a local insurance company where he allowed her to get out of the car. Before he left, the appellant gave SAH his telephone number.

Following the appellant's departure, SAH sat on the front steps of the insurance company until approximately 8:00 a.m. She then began walking "to wherever my feet led me." When she reached the Morristown-Hamblen County Rescue Squad, she asked volunteers at the rescue squad if she could sit down inside. She soon began crying, however, and, when one of the volunteers questioned her, she recounted to him the rape. The volunteer suggested that she go to a hospital and also notify the police. SAH was initially hesitant to call the police because the appellant was a constable but ultimately spoke with officers of the Morristown Police Department, providing several statements concerning the rape and identifying the appellant as the offender from a 1999 Hamblen County Sheriff's Department Yearbook.

-3-

At trial, SAH denied engaging in consensual intercourse with the appellant and denied offering to engage in intercourse with the appellant in exchange for money. However, she conceded that she never physically struggled with the appellant because she was afraid. She also conceded that, following the appellant's offenses, she informed June Morrisett of the Morristown Police Department that the appellant never threatened or hurt her. Finally, she conceded that she had previously made false 911 calls and had previously made and recanted allegations of rape against another man, namely her father. With respect to the allegations of rape against her father, she explained that she had only recanted the allegations because her paternal grandmother had offered food and lodging in return. She affirmed the truth of the allegations and, moreover, testified that her father had been convicted of sexually molesting her and was currently serving a prison sentence for his offense. SAH acknowledged that, following the discovery of her father's offense, she was placed in Lakeshore Mental Health Institute.

In addition to SAH's testimony, the State presented the testimony of Mike Kitts, a lieutenant with the Hamblen County Sheriff's Department. Kitts testified that, sometime after midnight on July 10, 1999, he spoke with the appellant by radio and requested the appellant's assistance in transporting a violent patient to Peninsula Hospital. The appellant responded that he was unable to assist as he "was busy or on some traffic at that time." On the same night, Kitts also observed the appellant in the parking lot of a Sav-A-Lot store near West Andrew Johnson Highway. The appellant appeared to be alone and was purchasing a drink from a vending machine. Finally, at approximately 4:00 a.m., Kitts was en route to Hardee's along with several other officers and encountered the appellant in the parking lot of a Red Food store at the intersection of Morristown Boulevard and West Andrew Johnson Highway. The appellant was seated in his vehicle with a female passenger. Kitts invited the appellant to accompany him and the other officers to Hardee's, but the appellant indicated that he was "giving his passenger a ride. Somebody had dropped her off or something, somewhere, and he had picked her up and was giving her a ride home." The appellant later joined the officers at Hardee's, and, when Kitts teased him about the woman in his vehicle, the appellant "laughed it off and said it wasn't like that, he was just giving her a ride."

Donald Oliver, a volunteer at the Morristown-Hamblen County Rescue Squad, also testified at the appellant's trial. He recounted that, on July 10, 1999, between 1:00 p.m. and 1:30 p.m., he was at the rescue squad and observed SAH walking along the road. She approached the rescue squad and sat down on a bench outside. When it began to rain, she approached the building and asked Oliver if she could stand inside the door. Oliver and another volunteer named Fred Payne invited her inside and also gave her a Coca-Cola. Oliver recalled that "[s]omething wasn't quite right about" SAH, and, in fact, she soon began to cry. When Oliver inquired if anything was wrong, she indicated that she had not eaten for three days. She also recounted to Oliver that a police officer had raped her. Oliver had difficulty understanding certain portions of SAH's account but ultimately understood that she had encountered the officer in Jefferson City, and he had offered her a ride to Morristown. En route to Morristown, the officer had stopped his vehicle at a building that was unfamiliar to SAH. The officer and SAH had then entered the building, where the officer removed SAH's clothing and raped her. Oliver noted that SAH appeared very tired and, as she related the rape, became very upset. Additionally, she was reluctant to report the rape to the police because her

assailant was a police officer. Oliver nevertheless consulted with several paramedics who were working with the rescue squad, and the paramedics notified the police.

June Morrisett of the Morristown Police Department confirmed that she spoke with SAH at the rescue squad on July 10, 1999. The officer noted that SAH's "mental capacity seemed somewhat diminished." Additionally, SAH cried intermittently as she reported to Morrisett that she had been raped by a police officer. After providing a statement, SAH led Morrisett to the ReMax Realty office building on West Andrew Johnson Highway.

Gary Kilgore, a detective sergeant with the Morristown Police Department, testified that, on July 10, 1999, he was dispatched to the ReMax Realty office building on West Andrew Johnson Highway, where he met several officers and SAH. Kilgore noted that the office building is located on a less traveled section of the highway, and the rear of the building is secluded, facing bare fields and woods. He specifically noted that the rear of the building cannot be seen from the highway. Inside the building, Kilgore examined and photographed the rear office in which the rape occurred. Kilgore recalled that the police removed hairs from two chairs located inside the office and also discovered paper towels, a panty liner, a Mello Yello can, and a cigarette package in an office trash can.

After examining the scene of the offenses, Kilgore interviewed SAH. Additionally, he contacted the appellant and asked him to come to the Morristown Police Department. The appellant acceded to Kilgore's request and, upon arriving at the station and being informed of SAH's allegations, also agreed to speak with Kilgore. On this occasion, the appellant admitted giving an unknown girl a ride in his vehicle on the previous night but denied taking the girl to the ReMax Realty office building or engaging in any form of sexual activity with her. Indeed, the appellant claimed that he was with the girl for only ten or fifteen minutes. The appellant admitted, however, giving the girl his telephone number. He explained that the girl had indicated she possessed information concerning illegal drug transactions. The appellant also admitted that his wife was formerly employed as a cleaning woman by ReMax Realty but denied possessing a key to the office building and asserted that he had not been inside the building since April.

On July 14, 1999, the appellant returned to the police department and provided a second statement to the police. On this occasion, the appellant admitted that he was inside the rear office of the ReMax Realty office building at approximately 1:00 a.m. on May 5th or 6th. According to the appellant, he was accompanied by a woman named Edna Heck, who performed oral sex upon the appellant. The appellant stated that he had also visited the office building with Heck on two prior occasions. The appellant explained that he had previously worked at the ReMax Realty office building and had discovered that the rear door could be opened with any key. The appellant concluded that the owners of the building were unaware of his activities inside their building.

On July 15, 1999, the appellant provided a third and final statement to Kilgore. On this occasion, the appellant again confirmed that he had previously visited the ReMax Realty office building with Heck but also confessed that he took SAH to the office building in the early morning

hours of July 10, 1999. He asserted that he went to the office building in order to make a telephone call. However, he conceded that, once inside the building, he only pretended to make a telephone call. The appellant recounted that, at that point, SAH unzipped his pants and fondled him. As she fondled him, she offered to engage in sexual intercourse with him in exchange for thirty dollars. The appellant asserted that he refused SAH's offer, whereupon she offered to "jack him off" for twenty dollars. The appellant claimed that he nevertheless persisted in his refusal to engage in sexual activity with SAH, and they soon left the building. The appellant admitted knowing that he "wasn't supposed to be in that ReMax Building" on the night of his offenses. However, the appellant also asserted that one of the owners of the building, "Monty," had once indicated to him that "it was okay to use or check out the building." Specifically, the appellant asserted that "Monty" had given him permission to use the telephones inside the building. He conceded that the owner never provided him with a key to the building.

During the course of his July 15, 1999 statement, the appellant initially denied engaging in sexual intercourse with SAH. However, when Kilgore reminded the appellant of the possibility that semen might be recovered from the victim, the appellant conceded that "there was some slight penetration." Nevertheless, the appellant insisted that he was entirely passive during his encounter with SAH, stating, "I didn't do it. I was standing there and she got a hold of it . . . ." The appellant noted that, on the night in question, SAH "acted . . . like she was on drugs or smoking pot or something. . . . I mean she talked sensible half the time."

Kilgore testified at trial that, in fact, no semen was found on vaginal swabs obtained from the victim, on the underwear worn by the victim on the night of the offenses, or on the panty liner and the paper towels recovered from the trash can at the ReMax Realty office building. He remarked, however, that saliva was detected on SAH's breasts.

Edna Heck also testified on behalf of the State. She admitted that she knew the appellant. However, she denied ever accompanying the appellant to the ReMax Realty office building, and she denied ever engaging in any form of sexual activity with the appellant.

Finally, Bob Mitchell testified that he and a man named Monty Sams were co-owners of the ReMax Realty office building on West Andrew Johnson Highway. He asserted that he never granted the appellant permission to enter the building on the night of these offenses.

The appellant declined to testify on his own behalf. Instead, he presented the testimony of Dorothy Hawk, a neighbor of SAH. Hawk related to the jury that, approximately two weeks prior to the appellant's offenses, she was sitting on her porch and overheard a conversation between SAH and another neighbor named Patricia Costner. During this conversation, Costner stated to SAH that she wanted to "get rid of" a boyfriend. Costner further remarked, "Well, I'll get him some way if I have to charge him with rape." SAH responded, "Well, I'll get somebody before you do."

-6-

Subsequently, Hawk read an article in the local newspaper concerning the appellant's offenses. Soon thereafter, she confronted SAH concerning the article, indicating that she did not believe SAH's accusation of rape. Hawk testified that SAH laughed and stated, "Well, the s.o.b. made me mad . . . [b]ecause he made me get out of his car." Hawk conceded that, upon reading the newspaper article, SAH became upset. However, Hawk asserted that SAH's agitation stemmed solely from a statement in the article indicating that SAH was mentally retarded.

Lorie Clark, another neighbor of SAH, testified that she too overheard the conversation between SAH and Costner during which Costner stated that she was going to accuse her current boyfriend of rape in order to "get rid of" him. According to Clark, Costner also stated that she had falsely accused a boyfriend of rape when she lived in Georgia. Clark added that she overheard yet another conversation between SAH and Costner prior to these offenses. During this second conversation, Costner asserted, "I'm going to get my name in the paper." SAH responded, "Well, I bet my name goes in the paper first before you." Moreover, Clark testified that she overheard a conversation between SAH and a "boyfriend"[2] named Hugh Allen during which SAH threatened to charge Allen with rape. Finally, Clark related that she was present when Hawk showed SAH the newspaper article concerning the appellant's offenses. Like Hawk, Clark testified concerning SAH's remark that the appellant had angered her by forcing her to get out of his car and refusing to drive her home. Moreover, like Hawk, Clark testified that SAH appeared upset by the reference in the newspaper article to her mental retardation. Clark noted that, in fact, SAH "was mentally handicapped to some degree." Clark conceded that SAH never indicated that she had fabricated her accusation against the appellant.

At the close of the trial, the jury convicted the appellant of aggravated rape, burglary, and official misconduct. Immediately thereafter, the trial court conducted a sentencing hearing, at the conclusion of which the court imposed an effective sentence of twenty-two years incarceration in the Tennessee Department of Correction. The appellant now appeals both his convictions and the trial court's sentencing determinations.

## II. Analysis

### A.       Sufficiency of the Evidence

The appellant first challenges the sufficiency of the evidence underlying his convictions. The appellant rests his challenge entirely upon the grounds that the trial was a credibility contest and the victim "is a chronic liar." We preliminarily note that the appellant's argument casts in bold relief the standards by which this court reviews the sufficiency of evidence. In particular, all factual issues raised by the evidence, including questions concerning the credibility of witnesses and the weight and value to be given the evidence, are resolved by the trier of fact and not this court. State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990). Thus, in order to successfully challenge a jury's resolution of factual issues in favor of the State, the appellant must demonstrate to this court that no "rational trier of fact" could have found the essential elements of the offense

---

[2]Clark testified that, to her knowledge, SAH did not have any boyfriends other than Allen, and Allen had stated to Clark that he and SAH were currently only friends.

beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982); Tenn. R. App. P. 13(e). These standards apply to convictions based upon direct evidence, circumstantial evidence, or both. State v. Carruthers, 35 S.W.3d 516, 557 (Tenn. 2000).

Consistent with the above standards, we have held that, generally, the uncorroborated testimony of a single witness will support a defendant's conviction. State v. Anthony Lynn Wyrick, No. E1999-02206-CCA-R3-CD, 2001 WL 472849, at *13 (Tenn. Crim. App. at Knoxville, May 4, 2001) (citing Letner v. State, 512 S.W.2d 643, 649 (Tenn. Crim. App. 1974)); see also State v. McKnight, 900 S.W.2d 36, 48 (Tenn. Crim. App. 1994); State v. Frank Kenneth Talley, No. 01C01-9612-CC-00524, 1999 WL 722631, at *4 (Tenn. Crim. App. at Nashville, September 17, 1999). This court will only intrude upon the province of the trier of fact and disturb its assessment of a witness' credibility in the rarest of cases. For example, this court will disregard a witness' testimony if it is "entirely irreconcilable with the physical evidence." State v. Hornsby, 858 S.W.2d 892, 894-895 (Tenn. 1993); see also State v. Matthew Douglas Cox, No. E1999-00351-CCA-R3-CD, 2000 WL 1562920, at *10 (Tenn. Crim. App. at Knoxville, October 20, 2000), perm. to appeal denied, (Tenn. 2001). Additionally, a witness' uncorroborated and contradictory statements made under oath and concerning the same fact will cancel each other if the contradiction is unexplained. State v. Matthews, 888 S.W.2d 446, 449-450 (Tenn. Crim. App. 1993); State v. Michael Dwayne Edwards, No. W1999-00591-CCA-R3-CD, 2000 WL 674671, at *3 (Tenn. Crim. App. at Jackson, May 16, 2000), perm. to appeal denied, (Tenn. 2000). More broadly, this court will disregard testimony "'if it is so indefinite, contradictory or unreliable that it would be unsafe to rest a conviction thereon.'" Letner, 512 S.W.2d at 649; see also Wyrick, No. E1999-02206-CCA-R3-CD, 2001 WL 472849, at *13.

We conclude that the appellant's case is not among the rarest of cases. SAH's testimony was consistent with physical evidence relating to the appellant's offenses and, moreover, was partially corroborated by the testimony of other State witnesses and the appellant's own, final statement to the police. The record is devoid of any sworn statement by SAH contradicting her testimony at trial concerning the appellant's offenses. Indeed, SAH has consistently maintained that the appellant raped her. As to SAH's "history of falsity and lies," we acknowledge this court's holding in Wyrick, No. E1999-02206-CCA-R3-CD, 2001 WL 472849, at *24 (citations omitted), that

> [p]rior false reports of crime are relevant to a witness's credibility. Similarly with regard to sexual offenses, the fact that a victim previously accused another of raping her is material to her charge of rape against the defendant if proof exists that the victim falsified the prior accusation.

Nevertheless, we do not believe that, in this case, the evidence of prior false reports of crime by SAH rendered her testimony at trial "so indefinite, contradictory or unreliable" as to be a nullity, particularly in the context of the appellant's inconsistent statements to the police. See, e.g., Hackney v. State, 551 S.W.2d 335, 339 (Tenn. Crim. App. 1977); State v. William Pierre Torres, No. E1999-00866-CCA-R3-DD, 2001 WL 245137, at *38 (Tenn. Crim. App. at Knoxville, March 13, 2001);

-8-

Otha Bomar v. State, No. 01C01-9808-CR-00342, 2000 WL 19763, at *3 (Tenn. Crim. App. at Nashville, January 13, 2000), perm. to appeal denied, (Tenn. 2000). Indeed, we note that it is not at all clear from the record that SAH's prior accusation of rape against her father was false. Correspondingly, testimony by defense witnesses about SAH's possible motives to fabricate an accusation of rape against the appellant merely presented a classic jury question.

Having declined to disturb the jury's assessment of SAH's credibility, we additionally conclude that the evidence is otherwise sufficient to support the jury's verdicts. With respect to the appellant's conviction of aggravated rape, the State was required to prove beyond a reasonable doubt the following essential elements: (1) the appellant engaged in the unlawful sexual penetration of the victim; (2) the appellant employed force or coercion to accomplish the act; (3) the appellant was armed with a weapon; and (4) the appellant acted intentionally, knowingly, or recklessly. Tenn. Code Ann. § 39-13-502(a)(1) (1997); Tenn. Code Ann. § 39-11-301(c) (1997). "'Force' means compulsion by the use of physical power or violence," Tenn. Code Ann. § 39-11-106(a)(12) (1997), and "coercion" is defined as a "threat of kidnapping, extortion, force or violence to be performed immediately or in the future," Tenn. Code Ann. § 39-13-501(1) (1997). "Sexual penetration" denotes "sexual intercourse . . . or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, . . . but emission of semen is not required." Tenn. Code Ann. § 39-13-501(7).

In this case, the appellant himself confessed to police that he engaged in "some slight" penile penetration of SAH's vagina or genital opening at the ReMax Realty office building. Moreover, while the appellant did not wield his gun during his sexual penetration of SAH, the aggravated rape statute only requires the State to establish "that the appellant's possession of a weapon 'occurred in association with the unlawful sexual penetration, whether . . . [the possession] occur[red] before, during, or after the actual sexual penetration.'" Cox, No. E1999-00351-CCA-R3-CD, 2000 WL 1562920, at *11 (alteration in original); see also State v. Randy Hodge, No. 91, 1991 WL 28952, at **4-5 (Tenn. Crim. App. at Knoxville, March 5, 1991). As noted earlier, SAH testified that, prior to engaging in sexual intercourse with her, the appellant placed his gun belt within "arm's reach" and ordered her to remove her shorts. She further recounted that, when she refused, the appellant raised his voice and told her that she had "better do it," whereupon she complied. Not only does this testimony establish the essential element that the appellant's unlawful sexual penetration of SAH was accompanied by his possession of a weapon, but the testimony also establishes the appellant's use of coercion or threat of force or violence, albeit the threat was implied, and his possession of the requisite mental state. See State v. Leland Ray Reeves, No. 01C01-9711-CR-00515, 1999 WL 155926, at *3 (Tenn. Crim. App. at Nashville, March 23, 1999) (holding that an "implicit threat of violence" qualifies as coercion under Tenn. Code Ann. § 39-13-501(1)); cf. McKnight, 900 S.W.2d at 48 (holding that, without force or threat, there could be no "coercion" as statutorily defined).

With respect to the appellant's conviction of burglary, the State was required to prove beyond a reasonable doubt the following essential elements: (1) the appellant entered a building, other than a habitation, that was not open to the public; (2) the appellant entered the building with

the intent to commit a felony, namely rape; (3) the appellant did not have the effective consent of the property owner; and (4) the appellant acted intentionally, knowingly, or recklessly. Tenn. Code Ann. § 39-14-402(a)(1) (1997); Tenn. Code Ann. § 39-11-301(c). "'Effective consent' means assent in fact, whether express or apparent, including assent by one legally authorized to act for another." Tenn. Code Ann. § 39-11-106(a)(9).

It is undisputed that the appellant entered the ReMax Realty office building on the night of these offenses when the building was not open to the public. As to the appellant's intent to commit a felony inside the office building, a defendant's "declared purpose is but one factor in ascertaining whether his entry was with felonious intent. 'One's actions are circumstantial evidence of his intent.' In addition, the circumstances surrounding the entry must also be viewed in determining intent." State v. Holland, 860 S.W.2d 53, 59 (Tenn. Crim. App. 1993) (citation omitted); see also State v. Christopher D. Smith, No. 03C01-9807-CR-00270, 1999 WL 482197, at *3 (Tenn. Crim. App. at Knoxville, July 12, 1999), perm. to appeal denied, (Tenn. 1999). We believe that the appellant's actions in this case and the circumstances surrounding his entry into the ReMax Realty office building justify the jury's conclusion that the appellant entered the building with the intent to rape SAH. We especially note that, notwithstanding the appellant's "declared purpose" of making a telephone call, the appellant admitted to police that he only pretended to make a telephone call once inside the building. Similarly, we note the isolated nature of the location to which the appellant transported SAH. As to any "effective consent" by the property owners to the appellant's entry into the office building on the night of these offenses, the record before this court supports a conclusion that the appellant did not have the effective consent of the owners, that the appellant was at least aware of the risk that he did not have the effective consent of the owners, and that he disregarded that risk. Cf. State v. James Albert Adams, No. M1998-00468-CCA-R3-CD, 1999 WL 1179580, at *7 (Tenn. Crim. App. at Nashville, December 15, 1999), perm. to appeal denied, (Tenn. 2000).

Further addressing the issue of effective consent, we again note Bob Mitchell's testimony that he never gave the appellant permission to enter the building on July 10, 1999. Of course, during his third and final statement to the police, the appellant contended that he had been given permission by the other co-owner, Monty Sams, to "use" the building to make telephone calls. Yet, the appellant also admitted knowing that he "wasn't supposed to be in that ReMax Building" on the night of his offenses and admitted that neither owner had given him a key to the building. Rather, he conceded that he was only able to enter the building following the close of business because, during his past employment by ReMax Realty, he discovered a defect in the lock securing the rear entrance. Moreover, in an earlier statement to the police, the appellant admitted that neither owner was aware of his late-night use of the office building. In short, "a jury is entitled to accept that portion of the [appellant]'s pretrial statement . . . that it deem[s] credible and reject that which it deem[s] to be false." State v. James Clayton Young, Jr., No. 01C01-9605-CC-00208, 1998 WL 258466, at *9 (Tenn. Crim. App. at Nashville, May 22, 1998).

Turning to the appellant's conviction of official misconduct, the State was required to prove beyond a reasonable doubt the following essential elements: (1) the appellant was a "public

servant"; (2) the appellant committed an act under color of office or employment that exceeded his official power; (3) the appellant acted intentionally or knowingly; and (4) the appellant intended to obtain a benefit or to harm another. Tenn. Code Ann. § 39-16-402(a)(2) (1997). A public servant "means a person elected, selected, appointed, employed, or otherwise designated as one (1) of the following . . . [a]n officer, employee, or agent of government." Tenn. Code Ann. § 39-16-401(3) (1997). Moreover, "a public servant commits an act under color of office or employment who acts or purports to act in an official capacity or takes advantage of such actual or purported capacity." Tenn. Code Ann. § 39-16-402(b). In this case, the appellant was on duty and in uniform as a constable in Hamblen County at the time of these offenses. See Tenn. Code Ann. § 8-10-101 to -117 (1993 & 2000 Supp.). He used the trust inspired by his official capacity to pick up a young woman in his vehicle, drive her to an isolated office building, and rape her. Accordingly, we conclude that a rational jury could have found all the essential elements of official misconduct. This issue is without merit.

## B.    Testimony Concerning Patricia Costner

The appellant next contends that the trial court erred in sustaining the State's objection to testimony by defense witness Hawk concerning Patricia Costner's accusation of rape against a boyfriend soon after the appellant's offenses. In essence, the appellant argues that the trial court's ruling constituted an impermissible comment upon the evidence due to the trial court's failure to clarify the grounds for its ruling. Moreover, the appellant asserts that the trial court's ruling denied him an opportunity to present a complete defense, thereby violating principles of due process embodied in the Fifth Amendment to the United States Constitution and Article I, Section 9 of the Tennessee Constitution.

The appellant's complaint arises from the following proceedings, during which defense counsel questioned Hawk concerning her confrontation with SAH about the newspaper article describing the appellant's offenses:

| | |
|---|---|
| Defense Counsel: | Was there anything else said during this conversation? |
| Hawk: | [Costner] said that she used to accuse people in Georgia of raping her. And my neighbor, other neighbor, asked why, and she said, Just to get attention. |
| Trial court: | That's - - - |
| Defense Counsel: | Wait, wait. Let's slow down. |
| Trial court: | Let's don't be talking about other things a third party said. |
| Hawk: | No, I'm sorry. |
| Defense Counsel: | After that took place, what next occurred? What happened then? |
| Hawk: | Well, a few days later [Costner's] boyfriend came in. I was sitting out on the porch. She |

|                  |                                                                                    |
| ---------------- | ---------------------------------------------------------------------------------- |
|                  | unlocked the door and let him in.  And I was sitting out on the porch.  I didn't hear a thing.  And she turned around and accused him of raping her. |
| Prosecutor:      | Judge, I'm going to object.                                                         |
| Trial court:     | Sustained.  It has - - What Patricia Costner said, members of the jury, has nothing to do with this case. |
| Defense Counsel: | Your Honor, if I could just - - Okay.                                               |

Following the above exchange, defense counsel quickly concluded his examination of the witness.

Our supreme court has observed that Article VI, Section 9 of the Tennessee Constitution prohibits judges from commenting upon the credibility of witnesses or otherwise expressing an opinion concerning the weight of the evidence presented during a trial.  State v. Suttles, 767 S.W.2d 403, 406 (Tenn. 1989); see also State v. Odom, 928 S.W.2d 18, 32 (Tenn. 1996); State v. Brown, 823 S.W.2d 576, 588 (Tenn. Crim. App. 1991); State v. Alberto Baretta Estes, No. 02C01-9512-CC-00379, 1997 WL 119510, at *2 (Tenn. Crim. App. at Jackson, March 18, 1997).  In other words, "the trial judge decides the law and . . . the jury decides the facts." State v. Jason Thomas Beeler, No. W1999-01417-CCA-R3-CD, 2000 WL 1670945, at *24 (Tenn. Crim. App. at Jackson, November 2, 2000).  Thus, while "[t]he propriety, scope, manner and control of examination of witnesses is within the trial court's discretion," State v. Harris, 839 S.W.2d 54, 72 (Tenn. 1992); see also State v. Hutchinson, 898 S.W.2d 161, 172 (Tenn. 1994); State v. John D. Joslin, No. 03C01-9510-CR-00299, 1997 WL 583071, at *42 (Tenn. Crim. App. at Knoxville, September 22, 1997); Tenn. R. Evid. 611(a), the trial court's exercise of its discretion must be consistent with the line drawn by our constitution dividing the functions of the judge and the jury. As in the instant case, claims that a trial court has "crossed the line" or abused its discretion may arise from the manner in which the court rules upon a party's objection to the admission of a witness' testimony.[3]

---

[3]The appellant argues in his brief that, "[b]ecause the State's objection was in improper form by not stating reason for his objection, the Court's exclusion of the evidence should be treated as . . . sua sponte."  Arguably, however, the specific bases for the exclusion of Hawk's testimony were apparent from the context in which the State proffered its objection.  See, e.g., Tenn. R. Evid. 103(a)(1).  First, the trial court had just sua sponte and without objection by defense counsel excluded from evidence on hearsay grounds other out-of-court statements made by Costner.  Second, the disputed testimony's questionable relevance to the appellant's case guaranteed an objection and, absent any response by defense counsel, the trial court's ruling in favor of the State.  In any event, the appellant himself acknowledges that a trial court's sua sponte exercise of control over the examination of a witness does not necessarily amount to an impermissible comment upon the evidence.  Thus, we have approved a trial court's sua sponte limitation of irrelevant testimony.  State v. Dooley, 29 S.W.3d 542, 548 (Tenn. Crim. App. 2000); State v. Combs, 945 S.W.2d 770, 774 (Tenn. Crim. App. 1996).  Similarly, we have held that

> it [is] not an abuse of discretion for the trial court to [sua sponte] require that counsel avoid compound questions, base his questions on facts in proof, limit hearsay testimony to allowable exceptions, and permit the witness to finish an answer without interruption.

Estes, No. 02C01-9512-CC-00379, 1997 WL 119510, at *3.  For the reasons subsequently set forth, we cannot conclude

(continued...)

That having been said, we do not believe that the trial court's ruling in this case and its accompanying instruction to the jury conveyed any opinion concerning the credibility of defense witnesses or the weight of evidence presented either for or against the appellant. Moreover, if defense counsel was concerned about the jury's possible misapprehension of the trial court's ruling and the grounds thereof, the appellant had an opportunity to request clarification from the trial court and failed to avail himself of that opportunity. Tenn. R. App. P. 36(a). Finally, at the conclusion of the trial, the trial court instructed the jury:

> At times during the trial I have ruled upon the admissibility of evidence. You must not concern yourself with these rulings. Neither by such rulings, these instructions, nor any remarks which I have made, do I mean to indicate any opinion as to the facts or as to what your verdict should be.

It is well settled in the state of Tennessee that a jury is presumed to have followed a trial court's instructions, and the record before this court does not rebut that presumption. Spicer v. State, 12 S.W.3d 438, 449 n.14 (Tenn. 2000).

As to the appellant's complaint that the trial court's ruling denied him an opportunity to present a complete defense, "[t]he Sixth Amendment [to the United States Constitution] and the Due Process Clause of the Fourteenth Amendment clearly guarantee a criminal defendant the right to present a defense which includes the right to present witnesses favorable to the defense." State v. Brown, 29 S.W.3d 427, 432 (Tenn.), cert. denied, __ U.S. __, 121 S. Ct. 275 (2000); see also State v. Phipps, 883 S.W.2d 138, 149 (Tenn. Crim. App. 1994) ("Defendants have a right to present competent and reliable evidence in support of their defenses."). The Tennessee Constitution similarly guarantees an accused a meaningful opportunity to present a competent defense, State v. Braden, 867 S.W.2d 750, 760 (Tenn. Crim. App. 1993), a right that our supreme court has suggested is coextensive with the federal constitutional guarantee, State v. Sheline, 955 S.W.2d 42, 47-48 (Tenn. 1997). However, the right to present a complete defense does not entitle a defendant to place before the jury irrelevant evidence. Id. at 47. Indeed, "even the right to present relevant evidence 'may, in an appropriate case, bow to accommodate other legitimate interests in the criminal trial process.'" Id.; cf. Brown, 29 S.W.3d at 432-436. In this regard, our supreme court in Brown, 29 S.W.3d at 433-434, set forth the necessary analysis when determining whether the constitutional right to present a defense has been violated by the exclusion of evidence. See also State v. Coley, 32 S.W.3d 831, 838 n.14 (Tenn. 2000). Specifically, courts must consider the following factors: (1) whether the excluded evidence is critical to the defense; (2) whether the evidence bears sufficient indicia of reliability; and (3) whether the interest supporting the exclusion of the evidence is substantially important. Coley, 32 S.W.3d at 838 n.14 (citing Chambers v. Mississippi, 410 U.S. 284, 298-301, 93 S. Ct. 1038, 1047-1049 (1973)); Brown, 29 S.W.3d at 433-434 (similarly citing Chambers, 410 U.S. at 298-301, 93 S. Ct. at 1047-1049).

---

[3](...continued)
that the trial court abused its discretion in this case.

Once again, the appellant's failure to request clarification of the trial court's ruling and, moreover, his failure to explain to the trial court the specific evidentiary basis supporting the admission of Hawk's testimony preclude our consideration of this issue. Tenn. R. App. P. 36(a); Tenn. R. Evid. 103(a)(2). Additionally, the appellant's argument on appeal, consisting of a summary assertion that, "[i]f . . . Hawk had been allowed to continue, her testimony would have been very relevant to the question on [SAH's] credibility, which was a central issue in this case," is inadequate and results in the waiver of this issue. Tenn. R. App. P. 27(a)(7); Tenn. Ct. of Crim. App. Rule 10(b). Indeed, we note that the appellant does not state what additional testimony would have been forthcoming from Hawk aside from her testimony concerning Costner's accusation of rape against a boyfriend following these offenses, nor did the appellant at any time attempt to submit an offer of proof to the trial court in accordance with Tenn. R. Evid. 103(a)(2). Finally, we conclude that any error was undoubtedly harmless. Chapman v. California, 386 U.S. 18, 24, 87 S. Ct. 824, 828 (1967). Although we may surmise that the appellant was attempting to present more evidence in support of his theory that Costner and SAH were engaged in an ongoing competition to make false accusations of rape and obtain mention in the local newspaper, this theory was otherwise clearly conveyed to the jury through the testimony of both defense witnesses.

## C.    Newly Discovered Evidence

The appellant next challenges the trial court's denial of his motion for new trial on the basis of newly discovered evidence. The appellant attached to his motion for new trial an affidavit completed by Robin Long, an inmate of the Hamblen County Jail. In the affidavit, Long asserted that, prior to the appellant's trial, she spoke with SAH "numerous" times concerning the victim's accusation of rape. According to Long, SAH admitted during these conversations that she had fabricated the accusation and additionally stated her intention to commit perjury at the appellant's trial. Long maintained in the affidavit that she did not talk with the appellant or appellant's counsel until March 30, 2000, following the conclusion of the appellant's trial. The affidavit, although signed by both Long and three witnesses, was not notarized. Defense counsel also completed an affidavit asserting that he "made diligent efforts to contact potential witnesses for Mr. Gass' defense," but "was not made aware of Ms. Robin Long's testimony or her existence until March 30, 2000." Defense counsel's affidavit was both signed and duly notarized.

The trial court conducted a hearing on the appellant's motion for new trial on March 31, 2000. At the hearing, the appellant made no attempt to present Long's testimony to the court or request a continuance of the hearing for the purpose of securing Long's presence. In any event, the court concluded:

> [I]t is something that at best is merely cumulative; similar evidence was presented at the trial. And, of course, the most incriminating evidence of all against Mr. Gass was his own statements and the tape recording in which he pretty well admitted everything that the prosecutrix claimed. I find that this does not meet the guidelines of newly discovered evidence. It did exist prior to the trial itself, and no different result would have been reached, anyway.

The decision to grant or deny a new trial on the basis of newly discovered evidence rests within the sound discretion of the trial court. State v. Goswick, 656 S.W.2d 355, 358 (Tenn. 1983); State v. Caldwell, 977 S.W.2d 110, 117 (Tenn. Crim. App. 1997). The trial court's exercise of its discretion is dependent upon (1) whether the defendant was reasonably diligent in attempting to discover the evidence; (2) whether the newly discovered evidence is material; and (3) whether the evidence would likely have changed the result of the trial. State v. Nichols, 877 S.W.2d 722, 737 (Tenn. 1994) (appendix); State v. Singleton, 853 S.W.2d 490, 496 (Tenn. 1993). Generally, "[a] new trial will not be granted when the newly discovered evidence would have no effect other than to impeach the testimony of a witness." State v. Joe Michael Green, No. 02C01-9711-CC-00429, 1999 WL 632235, at *3 (Tenn. Crim. App. at Jackson, August 20, 1999). However, this general rule will yield if the impeaching evidence "is so crucial to the defendant's guilt or innocence that its admission will probably result in an acquittal." Singleton, 853 S.W.2d at 496. Obviously, when a verdict is already one of questionable validity, even newly discovered evidence of relatively minor importance may be sufficient to create the requisite probability of acquittal. Id.

Applying the above principles, we decline to disturb the trial court's exercise of its discretion. Initially, we agree with the State that the affidavits submitted by the appellant fail to "set[] forth facts showing that he and his counsel exercised reasonable diligence and were not negligent in the search for evidence in preparation for the trial of the case," particularly in light of the possibility that Long's conversations with SAH occurred while SAH was herself incarcerated in the Hamblen County Jail prior to the appellant's trial. Jones v. State, 452 S.W.2d 365, 367 (Tenn. Crim. App. 1970); see also State v. Marlon D. Beauregard, No. W1999-01496-CCA-R3-CD, 2000 WL 705978, at *4 (Tenn. Crim. App. at Jackson, May 26, 2000), perm. to appeal denied, (Tenn. 2001). Moreover, even assuming the exercise of reasonable diligence by the appellant and defense counsel and acknowledging the materiality of the proposed testimony, we cannot conclude that the testimony would "probably" result in an acquittal. In reaching our conclusion, we note that the appellant's own lack of credibility undoubtedly played a crucial role in the jury's resolution of this case in favor of the State and further note the questionable credibility of the source of the proposed testimony. This issue is without merit.

## D.    Sentencing

Finally, the appellant challenges the length of his sentences. Appellate review of the length of a sentence is de novo. Tenn. Code Ann. § 40-35-401(d) (1997). In conducting its de novo review, this court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the pre-sentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statement by the defendant on his own behalf; and (7) the potential for rehabilitation or treatment. Tenn. Code Ann. § 40-35-102, -103 (1997), -210 (1999). See also State v. Ashby, 823 S.W.2d 166, 168 (Tenn. 1991). The burden is upon the appellant to demonstrate the impropriety of his sentences. Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments. Moreover, if the record reveals that the trial court adequately considered sentencing principles and all relevant facts and circumstances, this court will accord the trial court's determinations a presumption of correctness.

-15-

Id. at (d); Ashby, 823 S.W.2d at 169. For reasons set forth below, we do not defer to the trial court's determinations in this case.

The statutorily prescribed procedure for determining the length of a felony sentence is set forth in Tenn. Code Ann. § 40-35-210. The presumptive sentence for a class A felony is the midpoint in the range if there are no enhancement or mitigating factors. Id. at (c). In contrast, the presumptive sentence for both class D and E felonies is the minimum sentence in the range. Id. If there are enhancement and mitigating factors, a court must start at the presumptive sentence in the range, enhance the sentence as appropriate for the enhancement factors, and then reduce the sentence as appropriate for the mitigating factors. Id. at (e).

Again, the appellant was convicted of the class A felony of aggravated rape, Tenn. Code Ann. § 39-13-502(b), the class D felony of burglary, 39-13-402(c), and the class E felony of official misconduct, Tenn. Code Ann. § 39-16-402(d). At the sentencing hearing, the trial court found that all of the appellant's offenses "involved a victim and w[ere] committed to gratify the defendant's desire for pleasure or excitement." Tenn. Code Ann. § 40-35-114(7) (1997). Moreover, the court considered the appellant's abuse of a position of public trust in enhancing the sentences for the three offenses. Id. at (15). With respect to the appellant's convictions of burglary and official misconduct, the trial court further considered the appellant's possession of a firearm during the commission of the offenses. Id. at (9). Finally, in mitigating all of the appellant's sentences, the trial court noted the appellant's lack of any criminal record. Tenn. Code Ann. § 40-35-113(13) (1997). The trial court emphasized that the lack of a criminal record rendered it "unlikely that a sustained intent to violate the law motivated the [appellant's] criminal conduct." Tenn. Code Ann. § 40-35-113(11). In accordance with these considerations, the trial court imposed a mid-range sentence of twenty-two years incarceration in the Tennessee Department of Correction for the aggravated rape conviction, a maximum sentence of four years incarceration in the Department for the burglary conviction, and a maximum sentence of two years incarceration for the official misconduct conviction. The trial court ordered concurrent service of these sentences.

Preliminarily, we note that, on appeal, the appellant does not contest the trial court's consideration of his abuse of a position of public trust in enhancing all of his sentences, Tenn. Code Ann. § 40-35-114(15), nor does the appellant contest the trial court's consideration of his possession of a firearm during the commission of the burglary and official misconduct offenses, id. at (9). Pursuant to our de novo review, we agree that the trial court properly considered the latter factor in enhancing the appellant's sentences for burglary and official misconduct. However, we must conclude that the trial court improperly applied the enhancement factor relating to the appellant's abuse of a position of public trust to enhance his sentence for official misconduct. This court has previously held that the abuse of a position of public trust is inherent in the offense of official misconduct and, therefore, cannot enhance a sentence for that offense. State v. Billy Bivens, No. E1999-00086-CCA-R3-CD, 2000 WL 968789, at *9 (Tenn. Crim. App. at Knoxville, July 14, 2000).

The appellant does challenge the trial court's enhancement of all of his sentences on the basis that he committed the offenses to gratify his desire for pleasure or excitement. Tenn. Code

Ann. § 40-35-114(7). In particular, the appellant complains that the court failed to "state what facts or circumstances he bases his decision on." We agree with the appellant that the trial court should include in the record "specific findings of fact upon which application of the sentencing principles was based." Tenn. Code Ann. § 40-35-209(c) (1997); Tenn. Code Ann. § 40-35-210(f); see also State v. Dies, 829 S.W.2d 706, 710 (Tenn. Crim. App. 1991); State v. Jason C. Carter, No. M1998-00798-CCA-R3-CD, 2000 WL 515930, at *10 (Tenn. Crim. App. at Nashville, April 27, 2000), perm. to appeal denied, (Tenn. 2000). Moreover, we agree with the appellant that the trial court minimally, at best, complied with this requirement in applying the enhancement factor set forth in Tenn. Code Ann. § 40-35-114(7). Nevertheless, pursuant to our de novo review, we approve the trial court's consideration of this factor.

First, the factor is not inherent in any of the appellant's offenses, and, therefore, application of the factor did not run afoul of the general rule that factors which are elements of or otherwise inherent in a particular offense "should not be given substantive weight in increasing a sentence." State v. Pike, 978 S.W.2d 904, 927 (Tenn. 1998); see also State v. Winfield, 23 S.W.3d 279, 283 (Tenn. 2000). In particular, our supreme court has observed that many rapes are committed for purposes other than pleasure or excitement. State v. Carico, 968 S.W.2d 280, 286 (Tenn. 1998); see also State v. Spratt, 31 S.W.3d 587, 608 (Tenn. Crim. App. 2000). Moreover, the evidence adduced by the State at the appellant's trial established that he committed the rape in this case and, therefore, the burglary and official misconduct offenses for the purpose of pleasure or excitement. For example, SAH testified at trial that, prior to raping her, the appellant discussed with her "different ways you could [engage in sexual intercourse] and that - - and different positions and stuff like that." Moreover, SAH testified that the appellant kissed her, "rubb[ed] . . . on [her] breasts and down in the vaginal area," and "suck[ed] on [her breasts]" prior to engaging in sexual intercourse with her. Finally, in his statement to the police, the appellant conceded that he achieved an erection during his encounter with SAH. Contrary to the appellant's suggestion in his brief, the State need not prove that a defendant ejaculated during the course of a rape in order to establish enhancement factor (7). See State v. Kissinger, 922 S.W.2d 482, 490-491 (Tenn. 1996) ("That orgasm did or did not occur is simply one factor a court may consider in determining whether the offender committed the offense to gratify the offender's desire for pleasure or excitement."); see also, e.g., State v. Eldred Reid, No. 01C01-9511-CC-00390, 1997 WL 311916, at *6 (Tenn. Crim. App. at Nashville, June 6, 1997) (approving the application of enhancement factor (7) to a defendant's sentence for rape, "[e]ven though [the defendant] did not ejaculate").

The appellant also complains, in essence, that the trial court failed to accord adequate weight to his lack of a criminal record in mitigating his sentences. Tenn. Code Ann. § 40-35-114(13). Specifically, the appellant argues that the trial court improperly "merged" its consideration of the appellant's criminal record or lack thereof with its consideration of the mitigating factor set forth in Tenn. Code Ann. § 40-35-113(11), that the appellant committed the offenses "under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated the criminal conduct." The appellant observes in his brief, "The Court's merging of the two distinct mitigating factors becomes an issue because the Court makes his sentence determination based on how many mitigating factors there were versus how many enhancement factors there were."

-17-

Contrary to the appellant's observation, this court has previously stated that "[t]he appellant's sentence is not determined by the mathematical process of adding the sum total of enhancing factors present then subtracting from this figure the mitigating factors present for a net number of years." State v. Boggs, 932 S.W.2d 467, 475 (Tenn. Crim. App. 1996). Rather,

> [t]here is no particular weight assigned to any given [mitigating or] enhancement factor by the 1989 Sentencing Act and the "weight afforded mitigating or enhancement factors derives from balancing relative degrees of culpability within the totality of the circumstances of the case involved." In other words, the weight given to any existing factor is left to the trial court's discretion so long as it complies with the purposes and principles of sentencing and its findings are adequately supported by the record.

State v. Shropshire, 874 S.W.2d 634, 642 (Tenn. Crim. App. 1993) (citation omitted). Thus, even if the trial court weighed the two mitigating factors at issue less heavily than the appellant feels appropriate by "merging" its consideration of the factors, the appellant is not thereby entitled to relief.

In any case, we conclude that, while the record supports the trial court's consideration of the appellant's lack of any criminal history,[4] the record preponderates against the trial court's application of mitigating factor (11). As noted by the trial court, whether a defendant possesses a criminal history may be relevant to whether a sustained intent to violate the law motivated his criminal conduct in the case under consideration. Cf., e.g., State v. Carlos Demetrius Harris, No. E2000-00718-CCA-R3-CD, 2001 WL 9927, at *12 (Tenn. Crim. App. at Knoxville, January 4, 2001); State v. Joe C. Anderson, No. E1999-02485-CCA-R3-CV, 2000 WL 1285258, at *6 (Tenn. Crim. App. at Knoxville, September 12, 2000), perm. to appeal denied, (Tenn. 2001). Nevertheless, the State adduced circumstantial evidence at trial that the appellant drove SAH to the ReMax Realty office building with the intent to rape her, sustained this intent upon entering the building, and further persisted in this intent despite SAH's ensuing and repeated protests.

In sum, enhancement factors (7) and (15) are applicable to the appellant's sentence for aggravated rape; enhancement factors (7), (9), and (15) are applicable to the appellant's sentence for burglary; and enhancement factors (7) and (9) are applicable to the appellant's sentence for official misconduct. Tenn. Code Ann. § 40-35-114. Moreover, the appellant's lack of any prior criminal history is an appropriate consideration in determining the length of the appellant's sentences for all three offenses. Tenn. Code Ann. § 40-35-113(13). These conclusions leave the appellant's sentences for aggravated rape and burglary undisturbed. However, because the trial court improperly relied upon the appellant's abuse of a position of public trust in imposing a maximum sentence of

---

[4]Our supreme court recently approved a court's consideration of a defendant's lack of a criminal history in mitigating a defendant's sentence. State v. Gutierrez, 5 S.W.3d 641, 646-647 (Tenn. 1999). Thus, in State v. Kelley, 34 S.W.3d 471, 483 (Tenn. Crim. App.), perm. to appeal denied, (Tenn. 2000), we observed that, "relative to sentencing, an individual's past essentially stands as a witness either for or against him or her."

two years incarceration in the Department for the official misconduct conviction, we reduce the appellant's sentence for that offense to one year and five months incarceration.

### III.  Conclusion

For the foregoing reasons, we affirm the judgments of the trial court in the aggravated rape and burglary cases and affirm as modified the judgment of the trial court in the official misconduct case.

_____
NORMA McGEE OGLE, JUDGE