IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs October 1, 2002

## STATE OF TENNESSEE v. ANTHONY HUMPHREY

**Direct Appeal from the Criminal Court for Shelby County**
**Nos. 97-01305, 06, 07, 08     Arthur T. Bennett, Judge**

_____

### No. W2002-00195-CCA-R3-CD - Filed May 16, 2003

_____

The defendant was convicted of voluntary manslaughter, attempted voluntary manslaughter, attempted aggravated robbery, and attempted especially aggravated robbery. He was sentenced to six years for the voluntary manslaughter conviction, four years for the attempted voluntary manslaughter conviction, six years for the attempted aggravated robbery conviction, and twelve years for the attempted especially aggravated robbery conviction. The attempted voluntary manslaughter conviction was ordered concurrent with the other three convictions which were ordered consecutive to one another, for an effective sentence of twenty-four years. On appeal, the defendant raises three issues for our review: (1) whether the evidence was sufficient to support his convictions; (2) whether the trial court committed plain error by allowing testimony concerning his gang affiliations; and (3) whether the trial court appropriately sentenced the defendant. Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which DAVID H. WELLES and JAMES CURWOOD WITT, JR., JJ., joined.

Marty B. McAfee (on appeal) and Coleman W. Garrett (at trial), Memphis, Tennessee; Leon G. Scroggins, Granite City, Illinois (at trial); and Jonathan Goldberg, Atlanta, Georgia (at trial), for the appellant, Anthony Humphrey.

Paul G. Summers, Attorney General and Reporter; David H. Findley, Assistant Attorney General; William L. Gibbons, District Attorney General; and Lee V. Coffee, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS

This appeal resulted from an attempted robbery that occurred on the night of August 16, 1996, at the Andrew Jackson Apartments in Memphis, in which one victim was killed and another was wounded.

Kevin Helms testified that, on August 16, 1996, Christopher Howard asked to borrow $400, saying that he was on the verge of being evicted from his apartment.[1] Helms did not have the money to make the loan, so Howard returned to his apartment. Howard came back out with a backpack and left on foot. A half-hour to an hour later, Howard returned to his apartment with "six Mexicans." With Rob Fulford present, Helms again spoke with Howard later that night and learned of Howard's plan to sell some guns to the Mexican men to get the $400 that he needed. At some point in the conversation:

> [S]omebody came up with the idea– Chris [Howard] was going to sell the guns, and they said why you going to sell some guns when you could just take them. They ain't nobody but some Mexicans. They could take the guns. He could sell them and then could go around and take them right back, just get the money.

According to Helms, the "somebody" who came up with the idea to take the guns back and keep the money was Fulford.

Helms testified that the group, because they were "amateurs" in the ways of armed robbery, discussed enlisting the defendant's participation because "he had did [sic] something like that before." Helms knew the defendant "from around the neighborhood," but they were not closely acquainted. The defendant arrived on the scene and expressed his desire to participate, resulting in an argument with Fulford as to who would use the .38 and who would use the nine-millimeter in the execution of their plan. According to Helms, this controversy was resolved by the defendant's using the .38 and Fulford using the nine-millimeter. Apparently, Howard had five guns in a backpack with three to be sold, the defendant and his codefendants then using their two remaining pistols to rob the victims of the three pistols just sold to them. A plan was devised whereby Howard was to go to the victims and initiate the sale of the guns, while the defendant and Fulford watched from behind a fence for Howard to put his backpack over his shoulder as this was the cue for them "to go through the fence and go over there and rob the Mexicans." However, according to Helms, as Howard was talking to the victims, the defendant and Fulford grew impatient, went through a hole in the fence, and proceeded toward the victims. The victims, seeing two men masked with bandanas, started running. As Helms described, "It was like chaos. Everybody just started running," and the defendant and Fulford started shooting. Helms elaborated:

---

[1] Both Helms and Howard were codefendants.

I don't think [Fulford] was trying to shoot nobody, but he was just shooting real wild in the air like that. I guess he was trying to scare them or something. He was just shooting in the air. Well, I ain't going to say in the air, but he wasn't shooting like aiming at somebody like that. He was just shooting, you know.

. . . .

[The defendant] was doing the same thing, you know. He was just shooting[.]

Julian Becerarra Pereida, the victim in the voluntary manslaughter and attempted especially aggravated robbery, did not run but stood in front of the defendant with his hands raised. The defendant pointed his gun at the unarmed victim, who did not say a word. After this brief standoff, the victim turned and ran, at which point the defendant shot twice, the first shot hitting the victim in the chest. The defendant, Fulford, and Helms, who maintained that he was an observer rather than a participant, fled to Howard's apartment. Helms testified that, about an hour after the shooting, he asked the defendant why he shot the victim and his only response was, "I don't give a fuck."

Christopher Howard testified that he was outside his apartment with the defendant, Kevin Helms, and Rob Fulford on August 16, 1996. He explained that the others knew of his plan to sell some guns that evening, which he sometimes did after taking guns as payment for drugs. According to his testimony, however, he had no plan or agreement with the defendant or Fulford to rob the victims after the sale. With the guns in his backpack, he approached the victims by himself in order to negotiate a price when the following occurred:

[W]e were talking – they started running, and as I looked, you know, I heard shots, and when I heard shots, I looked and out of my peripheral vision – cause I started running too because I heard shots. I was running with the Mexicans, and I seen three guys come around the corner with bandanas on . . . and they just started shooting, and they started running, and I started running.

. . . .

[W]hen I heard the gunshot and I started running . . . I see somebody that look just like [Fulford], but he had, you know, the physical stature – he had something around his face, but [Fulford] is dark skinned and he's short, and I seen fire coming out of a gun, and I seen [the defendant].

Howard ran straight to his apartment, went inside, and locked the door.

Howard testified that he was walking his dog the next day when the defendant approached him and said, "[Y]ou know if you say anything to the police, the folk going to get you and your wife." Howard interpreted that as a threat and, when he was arrested the next day in relation to the shooting, he told the police that he did not know anything about the incident because he "was afraid of [what] all his associates and him . . . might do to his wife." Howard next saw the defendant in jail:

> [W]hen we first was locked up and we was [sic] downstairs and in the holding tank, I was just sitting back disgusted, and he was just sitting there bragging about it to some guys in the holding tank.
>
> . . . .
>
> [H]e was like, "Yeah, I blowed that Mexican's ass off."
>
> . . . .
>
> He was just like it wasn't nothing, you know what I'm saying . . . it wasn't nothing.

Tanilado Gonsales Rodriguez,[2] the victim in the attempted voluntary manslaughter and attempted aggravated robbery convictions, testified as to the events the night of August 16, 1996. Through an interpreter, he said that he, Julian Pereida, Ciro Rodriguez, and Erasmo Rodriguez were drinking "[j]ust a little" beer outside their apartment at the Andrew Jackson Apartments. Sometime after dark, a black man approached, offering to sell two or three pistols. Because Tanilado Rodriguez did not speak English, Ciro Rodriguez dealt with the man to arrange a sale. He had $500 with which he was going to pay for the guns. Later that night, the man with the guns returned and the sales discussions, which the witness could not understand, continued. Although Tanilado Rodriguez and his friends wanted to conduct the transaction upstairs, the seller insisted that it occur outside. The witness said, "[A]ll of a sudden I saw them running. And I ran myself, and then after that . . . there were some shots." As he was running, the witness was shot in the back of his leg. Although he did not see who fired the shots, he did see that Julian Pereida had also been shot. He said that neither he nor his friends had guns or had threatened anyone.

Ciro Rodriguez testified that he and his friends were drinking outside their apartment on the night of August 16, 1996, when they were approached by a black man offering to sell three guns for $500, apparently identifying the seller as Christopher Howard.[3] Tanilado Rodriguez showed the

_____

[2] The witness testified that his "real name" is Jose Remedos Fernandez and that he goes by Remedos. However, because he is identified throughout the record as Tanilado Gonsales Rodriguez, we will utilize that name.

[3] The record is not entirely clear as to whether the witness identified Christopher Howard or Kevin Helms as the man selling the guns. With both men in front of him, he identified the man "who tried to sell us the guns" only as

(continued...)

seller $500 and the seller left, returning a half-hour later, followed by some other men with bandanas covering their faces. Ciro Rodriguez first saw Erasmo Rodriguez run past him, prompting him to run and, while he was fleeing, he heard shots fired. He did not see the shooter, and neither he nor his friends had guns or had threatened anyone.

Erasmo Rodriguez, also testifying through an interpreter, said that a man, identified as Christopher Howard, approached him and his friends about buying some guns around 10:30 p.m. on August 16, 1996. The man showed them three guns and Tanilado Rodriguez showed him $500, at which point the man said he was going to go talk to a friend and would return in thirty minutes. When he returned, his face was covered and another man was with him. This sight caused Rodriguez to run, and a shot was fired. He testified that he did not see who did the actual shooting and that neither he nor his friends had guns or had threatened anyone. When detectives were talking to Erasmo Rodriguez the next day at the Andrew Jackson Apartments, Rodriguez saw the man who had tried to sell him guns the previous night and informed the detectives.

Julio Cesar[4] testified, through an interpreter, that he was the son of Julian Pereida. He said that his father had come to Memphis in January 1996 and found work in construction. He was thirteen years old at the time of his father's murder and "didn't see anything . . . just saw his [father's] corpse."

Officer Thomas Tilton of the Memphis Police Department testified that, on August 16, 1996, around 10:30 p.m., he received "a shooting call with one down and another one wounded on the scene" at the Andrew Jackson Apartments. As the first officer to arrive at the scene, Officer Tilton "found one male Hispanic laying on the ground and checked him immediately. He was dead, and then there was a second male Hispanic who was holding his leg with a shirt or a towel or something wrapped around it that had been shot and a whole bunch of other people standing around." Describing the condition of the victims, Tilton continued:

> [O]ne bullet had entered . . . his chest, and . . . one bullet had entered into his arm. There was a large amount of blood on him, a large amount of blood on the ground as well as on the sidewalk . . . and then the second male Hispanic he had a lot of blood coming down to his leg."

Officer Tilton "[g]ot a description of three male black subjects that were supposed to be responsible for the shooting and attempt (sic) robbery."

---

[3](...continued)
"the one that's wearing glasses." The identification is clarified when, as between Howard and Helms, the former is described as "the short person with the glasses."

[4]The witness testified that his "complete and full name" is Julian De Saris of Sauceda, but that he is called Julio Cesar, and he is identified as such in the record.

Shelby County Medical Examiner Dr. O'Brian Cleary Smith testified that Julian Pereida's cause of death was "due to a gunshot wound to the chest with heart injury and massive internal bleeding." The victim also had a gunshot wound on his right arm. Because no bullets or fragments were recovered from the body, the type of gun used was undeterminable.

Lieutenant Ottis Stewart of the Memphis Police Department testified that the defendant voluntarily came to the police station on August 20, 1996, saying he had heard that the police wanted to speak with him. The defendant was read, and subsequently waived, his Miranda rights, denying any involvement in the shooting. He said that he "was at home all day with [his] girl . . . sitting and drinking and smoking marijuana and getting high" when he heard the gunshots outside the apartment. He said that he did not own a gun.

Captain Charles Logan of the Memphis Police Department testified that he took a second statement from the defendant later that same day. The defendant was again read his Miranda rights, which he again waived. In his second statement, the defendant said that he had been involved in the robbery at the Andrew Jackson Apartments, along with "Chris, Rob, and Kevin," each of whom had weapons. He said he was armed with a .22 revolver but never fired any shots and was "in shock" when Chris and Rob fired their guns, even though he had been aware of the plan to rob the victims and "was looking for some money," but "didn't get any."

Lena Jones, the defendant's second cousin, testified as the first defense witness, saying that police officers had come to her apartment and that of the defendant's mother, as they were searching for the defendant. The officers told Jones that "they was [sic] looking for [the defendant] and wherever they saw him, they was [sic] going to shoot him on the spot." The defendant's mother, Kathleen Jackson, testified she told the defendant that he should turn himself in to the police because "the police would shoot him on the scene."

The defendant testified that he was playing dice at a friend's apartment on August 16, 1996, when Chris Howard and Kevin Helms approached him about selling guns to some Mexican men. After he finished shooting dice, and as he was walking to his mother's residence in the Andrew Jackson Apartments, he heard gunshots and saw Chris Howard, Kevin Helms, and Rob Fulford running from the area of the shooting. He, too, began running and, in the process, threw down the .22 revolver he had been carrying. He said that, when he signed the waiver of rights form at the police department, he did not know what it meant and asked for a lawyer but was told by the police, "we don't do that." He said his first statement was truthful, that he had been with his girlfriend, Adrian Hall, when they heard the shots fired. His second statement, that he had been involved in the robbery, was false, but the officers said they would let him go if he made this statement.

## ANALYSIS

### I. Sufficiency of the Evidence

The defendant argues that the evidence was insufficient to support his convictions for voluntary manslaughter, attempted voluntary manslaughter, attempted aggravated robbery, and attempted especially aggravated robbery because the State's primary witnesses were his codefendants and the testimony was "conflicting and inconsistent."

In considering this issue, we apply the familiar rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560, 573 (1979); see also State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992); Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

As the defendant points out, his codefendants were the only witnesses at trial who identified him as being involved in the shooting, and a defendant cannot be convicted on the uncorroborated testimony of an accomplice. State v. Bigbee, 885 S.W.2d 797, 803 (Tenn. 1994), explains this principle:

> "[T]here must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must

also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence. The corroboration need not be conclusive, but it is sufficient if this evidence, of itself, tends to connect the defendant with the commission of the offense, although the evidence is slight and entitled, when standing alone, to but little consideration."

Id. (quoting State v. Gaylor, 862 S.W.2d 546, 552 (Tenn. Crim. App. 1992).

Here, sufficient evidence exists within the record from which a rational trier of fact could conclude that the defendant was guilty of voluntary manslaughter, attempted voluntary manslaughter, attempted aggravated robbery, and attempted especially aggravated robbery. Two victims identified Chris Howard as the person who initiated the gun sale, and Howard testified that the defendant was one of the two men who ambushed the victims. He further testified that, while the two were incarcerated together, the defendant boasted, "I blowed that Mexican's ass off." Additionally, Kevin Helms testified that it was the defendant who fired the fatal shots. Although the defendant first gave a statement in which he denied any involvement in the crime, he later admitted that he was armed with a .22 pistol and intended to share in the robbery proceeds, although denying he participated in the robbery. At trial, he again denied involvement although he gave a different version of the facts than that in his first statement. Inconsistent statements following the event indicate a "consciousness of guilt from which the jury could infer unlawful conduct." Hackney v. State, 551 S.W.2d 335, 339 (Tenn. Crim. App. 1977); see State v. Stout, 46 S.W.3d 689, 697 (Tenn. 2001) (defendant admitted he was at crime scene, knew "one of the participants was armed and intended to steal a car," and another witness said he threatened her and her family if she testified); State v. Shaw, 37 S.W.3d 900, 903 (Tenn. 2001) (in possession of cocaine with intent to deliver case, defendant was driving car in which cocaine was found on the front seat, walked away shortly after the car was stopped, and appeared to be "extremely nervous before he was asked to produce his driver's license"). Accordingly, we conclude that the proof was sufficient to support each of the defendant's convictions.

## II. Plain Error

The defendant argues that the trial court committed plain error by allowing testimony implying that he was affiliated with the Gangster Disciples. To properly address this issue, which was not raised in the motion for new trial, we will establish the context in which this testimony was given.

During the direct examination of Christopher Howard, the State inquired into his earlier testimony that he had been threatened by the defendant:

Q   [D]id some police officers attempt to talk to you about what you know about this shooting?

A   Yes, sir.

Q   Did you talk to the police about it?

A   No, sir.

. . . .

Q   Were you afraid of [the defendant] when you told the police you didn't know anything?

A   Yes, sir.

Q   Were you afraid of what he might do to your wife?

A   I was afraid of all his associates and him what they might do to my wife.

At some point between the direct and cross-examinations of Howard, it came to the trial court's attention that the defendant's mother was overheard to say something toward Howard's mother that may have been a threat. With the jury out, the trial court inquired into the situation, and the State explained that precautions had been made so that the matter of gang affiliation would not be mentioned:

Part of what I'm trying to stay away from in this trial is there's an allegation that [the defendant] is a member of the Gangster Disciples, and that's why the word associates have [sic] been used. That's why Mr. Howard and Mr. Helms have told the jury that they did have some fear for themselves and their family.

Subsequently, during his cross-examination, Howard then was pressed by the defense as to why he had not initially told police officers of the defendant's involvement in the crimes, as he had done during his direct examination:

Q   When did you decide your testimony was so important that you would come and testify? Whether it would help your situation, when did you make that decision?

A    It does not help my situation, sir.

Q    Then why are you here?

A    Because I want the Court to know the truth.

Q    Did you want the police to know the truth when you first got arrested?

A     I didn't tell them anything because I was in fear of my family's life.

Q    Did you want the police to know the truth when you first got arrested?

A    Yes, sir.

Q    You didn't tell them the truth, did you?

A    I didn't say anything, sir.

Q    They asked you, did they not?

A    Yes, they asked me.

Q    You denied any knowledge of this situation, didn't you?

A    Yes, sir, I told them I didn't know anything.

Q    You were lying, weren't you?

A    Sir, let me – Judge, can I –

Q    Were you lying–

THE COURT:  You can answer yes or no, and then you can explain your answer.

A    Okay.

Q    Were you lying when you told the police you didn't know anything?

A    Yes, sir.

Q    But you wouldn't lie to this jury today–

THE COURT: Now, if he wants to explain that answer he can do it.

A    Yes, sir, I'd like to explain that, sir. Sir, where I live at . . . and my family lived at was infested with GD's.[5] If I would have said anything to those policemen, [the defendant] and all his folks they would have did something to my family.

[DEFENSE COUNSEL]: Your Honor, I object as to the speculating as to what would have happened under those circumstances, what [the defendant] would have done.

THE COURT: He's explaining his answer why he said what he said. Overruled. You may explain.

A    Yes, sir. I was in fear of my family's life because I was locked up, and they was out there among those people that would have caused them harm.

Q    Did you tell the police you were in fear of your life and fear of your family's life?

A    I didn't say anything, sir.

Q    Why didn't you tell them I can't tell you because I'm in fear of my life. My wife is in jeopardy because [the defendant] and the GD's are out there. Why didn't you tell the police that?

A    I was afraid, sir.

Q    You were afraid to tell them that you were afraid. Is that right?

A    That's right because Gangster Disciples be in jail also, sir.

    Thus, the trial transcript shows that after Christopher Howard was pressed by the defense as to why he had not earlier told of the defendant's involvement in the crimes, he used the initials "GD" in his response, explaining that he had not told police of his knowledge of the incident because he

---

[5]"GD" is a nickname for the Gangster Disciples.

-11-

feared for the safety of his family if he did so. The defense objected not to the use of the initials, but to the witness's "speculating what would have happened" if he had been truthful. Continuing this line of questioning, the defense itself then utilized the initials "GD" to ask a "why" question, why the witness did not tell the police that he was "in fear of [his] life" and his wife was "in jeopardy because [the defendant] and the GD's are out there." Again receiving the explanation that the witness had not been truthful with the police because he was afraid, the defense persisted with the same line of questioning, asking if the witness was "afraid to tell [the police] that you were afraid." The witness responded, "That's right because Gangster Disciples be in jail also, sir." No objection was made to this response.

The defendant argues on appeal that the trial court committed plain error by "allowing testimony concerning [the defendant's] purported affiliation with the Gangster Disciples." Thus, at trial, the objection was that the witness was speculating while, on appeal, it has been recast into the claim that unobjected-to testimony was prejudicial.

Tennessee Rule of Criminal Procedure 52(b) defines "plain error" as "error which has affected the substantial rights of an accused" and which "may be noticed at any time, even though not raised in the motion for a new trial or assigned as error on appeal, in the discretion of the appellate court where necessary to do substantial justice." Since the intention of the rule is to serve the ends of justice, it is invoked only in exceptional circumstances where necessary to avoid a miscarriage of justice. State v. Adkisson, 899 S.W.2d 626, 639 (Tenn. Crim. App. 1994) (citing United States v. Gerald, 624 F.2d 1291, 1299 (5th Cir. 1980)). The following factors should be considered by an appellate court when determining whether "plain error" has occurred:

> a) the record must clearly establish what occurred in the trial court;
>
> b) a clear and unequivocal rule of law must have been breached;
>
> c) a substantial right of the accused must have been adversely affected;
>
> d) the accused did not waive the issue for tactical reasons; and
>
> e) consideration of the error is "necessary to do substantial justice."

Id. at 641-42 (footnotes omitted). The presence of all five factors must be established by the record before this court will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established. State v. Smith, 24 S.W.3d 274, 283 (Tenn. 2000). Recognition of "plain error" should be limited to those errors that had an unfair prejudicial impact which undermined the fundamental fairness of the trial. Adkisson, 899 S.W.2d at 642.

We respectfully disagree that plain error, or error at all, resulted from the use by the witness of the words "Gangster Disciples" or the initials "GD." For several reasons, this assignment is without merit. First, it does not necessarily follow, as the defendant contends, that because the witness testified he had been afraid of reprisals by the Gangster Disciples if he told the police the truth about the crimes, the jury then would assume the defendant, himself, was a gang member. Additionally, the explanations by the witness, as to his fear of the Gangster Disciples, resulted from the defense continuing to press variants of "why" questions about the initial statement of the witness to the police. In fact, we note that, during this line of questioning, defense counsel, himself, utilized the initials "GD" in one of his questions. Thus, the defense contributed to the gang references, and it has long been settled that a party cannot take advantage of errors which it committed or invited. Tenn. R. App. P. 36(a). This assignment additionally is untenable because the defendant has switched theories as to the assailed testimony, arguing at trial only that the testimony was improper because the witness was "speculating" in explaining that he was untruthful to the police because he feared reprisals by gang members, while contending on appeal that the testimony was inadmissible because it "concerned [the defendant's] purported affiliation with the Gangster Disciples." Thus, the argument on appeal was neither presented to nor ruled upon by the trial court. A defendant may not object to the admissibility of evidence based on one argument, and then drop that argument and object to the same evidence based on a new argument. State v. Aucoin, 756 S.W.2d 705, 715 (Tenn. Crim. App. 1988) (citing State v. Brock, 678 S.W.2d 486, 489-90 (Tenn. Crim. App. 1984)).

Accordingly, we conclude that this assignment is without merit.

### III. Sentencing

The defendant argues that the trial court erred as to the lengths of the sentences and in ordering that three be served consecutively.

The trial court sentenced the defendant as a Range I offender to six years, the maximum sentence in the range, for the voluntary manslaughter conviction, four years for the attempted voluntary manslaughter conviction, six years for the attempted aggravated robbery conviction, and twelve years for the attempted especially aggravated robbery conviction. The attempted voluntary manslaughter conviction was ordered to be served concurrently with the other three convictions which were ordered to be served consecutively to one another, for an effective sentence of twenty-four years.

### A. Standard of Review

When an accused challenges the length and manner of service of a sentence, it is the duty of this court to conduct a *de novo* review on the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The presumption does not apply to the legal conclusions reached

by the trial court in sentencing the accused or to the determinations made by the trial court which are predicated upon uncontroverted facts. State v. Butler, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); State v. Smith, 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994); State v. Bonestel, 871 S.W.2d 163, 166 (Tenn. Crim. App. 1993). However, this court is required to give great weight to the trial court's determination of controverted facts as the trial court's determination of these facts is predicated upon the witnesses' demeanor and appearance when testifying.

In conducting a *de novo* review of a sentence, this court must consider (a) any evidence received at the trial and/or sentencing hearing, (b) the presentence report, (c) the principles of sentencing, (d) the arguments of counsel relative to sentencing alternatives, (e) the nature and characteristics of the offense, (f) any mitigating or enhancement factors, (g) any statements made by the accused in his own behalf, and (h) the accused's potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-103, -210; State v. Scott, 735 S.W.2d 825, 829 (Tenn. Crim. App. 1987).

The party challenging the sentences imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401, Sentencing Commission Cmts.; Ashby, 823 S.W.2d at 169. In this case, the defendant has the burden of illustrating the sentence imposed by the trial court is erroneous.

## B. Length of Sentence

In considering this issue, we first will review the defendant's prior criminal record. According to the presentence report, the defendant had at least two prior convictions for driving while license suspended or revoked. Additionally, he was convicted in 2000, while on bond for the crimes which are the basis for the present appeal, of driving while license suspended, cancelled, or revoked and of possession of drugs. Further, a report prepared by Shelby County Pretrial Services/County Probation for the defendant's bail application stated that, in 1992, he was convicted as a juvenile of "AA; CT," for which he was committed to the Tennessee Department of Youth Development. According to a statement of defense counsel at the sentencing hearing, one of these juvenile convictions was for a felony, making it appear that "AA" is an abbreviation for aggravated assault, a Class C felony. Also, the bond report sets out details of the defendant's subsequent conviction for violation of probation, saying that he had been placed on probation on September 7, 1994, for the unlawful possession of a weapon and was rearrested on October 15, 1994, for possession of a prohibited weapon, for which he later was convicted, and for theft of property over $500, for which he was not convicted.

In sentencing the defendant, the trial court applied the following eight enhancement factors:

> (1) The defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range;

-14-

(2) The defendant was a leader in the commission of an offense involving two (2) or more criminal actors;

(3) The offense involved more than one (1) victim;

(8) The defendant has a previous history of unwillingness to comply with the conditions of a sentence involving release in the community;

(9) The defendant possessed or employed a firearm, explosive device or other deadly weapon during the commission of the offense;

(10) The defendant had no hesitation about committing a crime when the risk to human life was high;

(16) The crime was committed under circumstances under which the potential for bodily injury to a victim was great; and

(20) The defendant was adjudicated to have committed a delinquent act or acts as a juvenile that would constitute a felony if committed by an adult.

Tenn. Code Ann. § 40-35-114(1), (2), (3), (8), (9), (10), (16), (20) (1997).

The defendant asserts that the trial court improperly applied factors (2), (9), (10), and (16), first arguing that factor (2), that the defendant was a leader in the commission of an offense involving two or more criminal actors, see Tenn. Code Ann. § 40-35-114(2), should not have been applied because it is not supported by the record. However, there was testimony that the participants sought to include the defendant because of his experience in such endeavors. After expressing his desire to participate, the defendant began to assert his influence on the operation by arguing about which gun he would use. Kevin Helms testified that it was the defendant who fired the fatal shots. Accordingly, we conclude that evidence existed to allow the trial court to apply this factor as to each offense.

The defendant argues that factor (9), that he possessed or employed a firearm during the commission of the offense, see Tenn. Code Ann. § 40-35-114(9), should not have been applied because it is an essential element of the four crimes for which he was found guilty. However, the defendant was found guilty of voluntary manslaughter, an offense that this court has held does not require the use of a weapon. State v. Shaun Michael Fleegle, No. E2000-02045-CCA-R3-CD, 2002 WL 83496, at *5 (Tenn. Crim. App. Jan. 22, 2002); see Tenn. Code Ann. § 39-13-211(a). Therefore, we conclude that this factor was properly applied to the convictions for voluntary manslaughter and attempted voluntary manslaughter. However, we conclude that factor (9) should not have been applied to the convictions of attempted aggravated robbery or attempted especially aggravated

-15-

robbery, for the use of a firearm is an element of those offenses. See State v. Nix, 922 S.W.2d 894, 903-04 (Tenn. Crim. App. 1995).

Additionally, the defendant argues that factor (10), that he had no hesitation about committing a crime when the risk to human life was high, see Tenn. Code Ann. § 40-35-114(10), should not have been applied because it is an essential element of the four crimes for which he was found guilty. Unlike enhancement factor (16), factor (10) is broadly written to include "risk to human life" and does not contain the restrictions to "the crime" and "a victim." State v. Imfeld, 70 S.W.3d 698, 707 (Tenn. 2002); see Tenn. Code Ann. § 40-35-114(10), (16). Addressing this issue at the sentencing hearing, the trial court stated:

> No. 10, that the defendant had no hesitation about committing a crime when the risk to human life was high. The Court feels . . . that's definitely a situation where he was firing at persons who were trying to flee from their attempt [sic] robbery, and right in an apartment . . . complex where people frequently are out there, children and everyone else; in addition to these persons, the Mexican people who were there together when the shooting started. Bullets could have hit anybody in the area. The risk to human life was high, very high in an apartment complex parking lot.

According to the testimony of Kevin Helms and other witnesses, the victims were part of a group of six Mexicans when the crimes were committed. However, it is not clear from the record the extent to which others were jeopardized by the shots fired by the defendant, at least some of which were in the air, according to Kevin Helms. Accordingly, we conclude that the record does not support applying this factor to any of the convictions. We believe that this same rationale applies to the application of enhancement factor (3), that the offense involved more than one victim. Thus, we conclude that this factor as well is not applicable to any of the convictions.

The defendant argues, and the State concedes, that factor (16), that the crime was committed under circumstances under which the potential for bodily injury to a victim was great, see Tenn. Code Ann. § 40-35-114(16), should not have been applied because it is an essential element of the four crimes for which he was convicted. We agree that factor (16) was not applicable to any of the convictions. See Imfeld, 70 S.W.3d at 706 (holding that there is nothing in the statutory language of factor (16) to indicate that it applies to potential victims or that it applies simply because the offense was committed in the presence of other individuals and that it is therefore not applicable when the offense involved bodily injury to a specific, named victim).

Additionally, the defendant urged the trial court to consider four mitigating factors. It appears that the trial court declined consideration of the defendant's mild retardation as a "mental or physical condition that significantly reduced the defendant's culpability for the offense," explaining that it had "little, if any, [e]ffect on his culpability, because his retardation was not significant enough to affect his culpability in this thing at all." See Tenn. Code Ann. § 40-35-113(8)

(1997). We note that the defendant testified at trial that he had completed the tenth grade and was employed by a grocery store chain. The record supports the trial court's determination not to credit the defendant's mild retardation as a mitigating factor. The trial court also declined to find that the defendant acted under duress during the commission of these offenses, see id. § 40-35-113(12), and the record supports this determination. Neither the testimony of the State's witnesses nor that of the defendant, who denied at trial that he was involved in the offenses, suggests that the defendant was under duress when he committed the crimes.

The defendant contends that the trial court should have applied mitigating factor (4), that he played a minor role in the commission of the offenses, and factor (6), that he, because of youth, lacked substantial judgment in committing the offense. See Tenn. Code Ann. § 40-35-113(4), (6). The trial court declined to apply factor (4) because of evidence that the defendant played a leadership role in the commission of the offenses. As to factor (6), the trial court stated:

> [The defendant] was not that young. In fact, he had been in juvenile court and committed serious offenses in juvenile court, in which, they tried to turn him around by putting him in some youth facility, counseling, and it did not help him. He was not of tender years . . . . He was old enough to take life, with judgment in the process. The Court will not find that his youth had anything to do with him committing this offense.

The record fully supports the trial court's conclusions as to the defendant's substantial prior experience with the legal system. Thus, the court did not err in declining to apply this mitigating factor.

Thus, following our review, we conclude that five enhancement factors apply to the convictions for voluntary manslaughter and attempted voluntary manslaughter, while four apply to the attempted aggravated robbery and attempted especially aggravated robbery convictions. No mitigating factors apply to any of these convictions. In determining the appropriate sentence for a felony conviction, the sentencing court, if there are enhancement factors but no mitigating factors, may set the sentence above the minimum in that range but still within the range. See Tenn. Code Ann. § 40-35-210(d) (Supp. 1999); State v. Boggs, 932 S.W.2d 467, 475 (Tenn. Crim. App. 1996). There is no mathematical formula of evaluating the enhancement factors to calculate the appropriate sentence. See generally id. "Rather, the weight to be afforded an existing factor is left to the trial court's discretion so long as the court complies with the purposes and principles of the 1989 Sentencing Act and its findings are adequately supported by the record." Id. at 475-76 (citations omitted). It is apparent from the record that the trial court appropriately considered the sentencing purposes and principles. Accordingly, we conclude that the trial court did not err in setting the lengths of the defendant's sentences.

## C. Consecutive Sentencing

The trial court ordered that three of the defendant's sentences be served consecutively, and this determination is an issue on appeal. As a general rule, consecutive sentences are imposed at the discretion of the trial court upon its consideration of one or more of the following statutory criteria:

> (1) The defendant is a professional criminal who has knowingly devoted such defendant's life to criminal acts as a major source of livelihood;
>
> (2) The defendant is an offender whose record of criminal activity is extensive;
>
> (3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;
>
> (4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;
>
> (5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;
>
> (6) The defendant is sentenced for an offense committed while on probation; or
>
> (7) The defendant is sentenced for criminal contempt.

Tenn. Code Ann. § 40-35-115(b) (1997).

The trial court applied criteria (2) and (4). The defendant does not contest the application of criterion (2), his prior record, as we have set out, consisting of a number of convictions and a probation violation. Although the defendant does challenge the application of criterion (4), the statutory criteria for consecutive sentencing are stated in the alternative; therefore, only one need

exist to support the appropriateness of consecutive sentencing. Accordingly, we conclude that the record supports the trial court's order that three of the defendant's sentences be served consecutively.

## CONCLUSION

Based upon the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE