Lester HACKNEY, Appellant,

v.

STATE of Tennessee, Appellee.

Court of Criminal Appeals of Tennessee.

Feb. 7, 1977.

Certiorari Denied by Supreme Court March 21, 1977.

Max E. Wilson and O. H. Wilson, Mountain City, for appellant.

Brooks McLemore, Atty. Gen., Linda Ross Butts, Asst. Atty. Gen., Nashville, David E. Crockett, Asst. Dist. Atty. Gen., Elizabethton, for appellee.

DAUGHTREY, Judge.

## OPINION

The prosecution in this case came about as the result of the death of Louise Matheson on June 14, 1975. Her body was found in the remains of her rural Johnson County home, which was completely destroyed by fire. Matheson's paramour, Lester Hackney was indicted for first degree murder and subsequently convicted of voluntary manslaughter. The jury assessed a sentence of four to ten years imprisonment.

The defendant raises multiple assignments of error on appeal, the most serious of which attack the sufficiency of the convicting evidence. He also claims (1) that the trial judge erred in admitting the testimony of a doctor whom the defendant insists was not a qualified expert in his field, (2) that the defendant's statement to the police was introduced in violation of his *Miranda*[1] rights, and (3) that evidence developed post-trial proves that the defendant was incompetent to stand trial at the time he was convicted. We have reviewed the last three assignments and find that they are not supported by the record. Further, we conclude that the evidence on appeal is sufficient to support the verdict of the jury and we therefore must uphold the defendant's conviction.

Evidence concerning the cause of death was presented by a licensed physician who had completed a four year residency in pathology, had two years experience as a hospital staff pathologist, and had conducted 250 autopsies. The trial court's determination that this witness was a qualified expert in the field of pathology, despite the fact that he had not yet been certified by the National American Board of Pathologists, did not constitute an abuse of discre-

1. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

tion as claimed by the defendant. There is no rule that a physician must be board certified in order to qualify as an expert in a given medical field.

 The *Miranda* complaint is based on the fact that the defendant refused to execute a written waiver of his rights after being given the obligatory warnings. The trial judge conducted a jury-out hearing and determined that no *Miranda* violation had occurred. The record supports his finding. The law recognizes that a written waiver is not the exclusive means of manifesting a valid waiver of *Miranda* rights, *Bush v. State,* 530 S.W.2d 95 (Tenn.Cr.App. 1975), and a refusal to sign a written waiver does not render a subsequent statement inadmissible when the evidence demonstrates that the statement was voluntarily made following adequate warnings.

 At a hearing on a supplemental motion for a new trial, the defendant introduced the deposition of a physician who had been treating him during a two year period prior to trial for a brain "abnormality." [2] The doctor had testified that calcification, perhaps caused by a brain tumor, had caused damage to a certain area of the defendant's brain and that "people with brain damage are more likely to be emotionally, easily emotionally upset and show poor judgment at times when their conduct is not well controlled." The doctor said that in his opinion the defendant would not respond normally in a trial situation because "a man like that under stress would not handle himself well." But the doctor did not testify that the defendant was then or had ever been incompetent to stand trial, *i. e.,* that he was unable to understand the nature of the proceedings or to advise counsel.

The defendant's attorney insists that Hackney's performance as a witness demonstrates his incompetency. The record fails to support this contention. The defendant

experienced no difficulty in testifying until he was subjected to rigid cross-examination by the prosecutor. Up to this point he showed a remarkable facility for detail and clarity as to the events transpiring during the thirty-six hours prior to Matheson's death. It was only when he was asked on cross-examination for a logical explanation of his illogical conduct and inconsistent statements following the crime that he experienced difficulty on the stand. It seems apparent that if Hackney's testimony became unsatisfactory at any point, it was due not to any incompetency on his part, but rather to the formidable task of attempting to explain away evidence of his guilt. The trial court committed no error in refusing to set aside the verdict based on the alleged incompetency of the defendant.

 There remains the question of the sufficiency of the convicting evidence. The proof at trial was wholly circumstantial in nature. Hackney and Matheson had been dating for more than a year, and there was evidence that their relationship was somewhat stormy. They had spent the night before the homicide together at a Johnson city motel, visiting various saloons the next day. They arrived back in the rural area where Matheson lived at 9:00 or 9:30 P.M. on June 13th and went to the small house that she occupied by herself. By the defendant's own admission they had been arguing throughout the day.

Fire broke out at the house just before midnight. It was discovered by neighbors and reported to the local volunteer fire department. The house was completely consumed by flames, although the firemen were able to wet down one corner of the structure long enough to allow recovery of Matheson's body. She was found lying face down in the corner of a room between a bed and a wall. The space between measured approximately three and one-half feet. The body had suffered third and fourth degree burns.

**2.** The question of the defendant's competency to stand trial had not been raised prior to trial. However, the State did not contest the defendant's right to raise the issue after trial. In fact, the prosecutor very commendably set the machinery in motion to secure the doctor's post-trial deposition. Based on the content of that deposition, he later resisted the defendant's motion for a new trial on the basis of incompetency.

An autopsy revealed three fractures of the skull. Two were zig-zag fractures caused by the heat of the fire. The third was a depressed fracture of the top right of the skull, measuring one by one and one-half centimeters. A small tack hammer was found on the floor some two feet from the body. The pathologist was unable to state positively that the blow causing the fracture had come from the hammer. He was likewise unable to tell if it had been inflicted before or after death. He thought the trauma was likely non-fatal, although the blow could have rendered the victim unconscious. The cause of death was an extremely high carbon monoxide level in the bloodstream, caused by smoke inhalation.

An arson investigator called in on the case was unable to determine where or why the fire started, and he therefore characterized it as "suspicious" in its origin. There was no electric power in the house at the time. He found several holes in the floor of the house, a common indication that an accelerant had been used. He determined that all the holes but one could be explained by the fact that firefighters on the scene had broken through the floor. The single exception was a hole in the floor located at the foot of the bed next to which the deceased's body was found. The arson investigator could not explain how it was caused. (No direct evidence of an accelerant was present after the fire was put out. A consent search of the defendant's car produced a plastic container that had an odor of fuel, but which was bone dry.)

The arson investigator testified that he found no debris on or near the body which might have caused the trauma to the deceased's head. Indeed, he concluded that because of its position between the bed and the wall, the body would have been shielded from falling debris.

The first neighbor to reach the scene found the entire house engulfed by flames and the defendant's car sitting in the yard. He called out but received no response from the car. He left to summon help and when he returned the defendant's automobile was gone. Another neighbor arrived to find that the roof had fallen in. Knowing of the relationship between Hackney and Matheson, he went to the defendant's family home. There he found the defendant on his way from his car to the house. The neighbor asked if Hackney knew where Matheson was, to which Hackney replied in the negative, saying that he had been asleep in the car. The neighbor told him Matheson's house was afire and asked if it were possible that she was still inside. The defendant answered "I'd say she could be," and went into the house, presumably to bed. Although the neighbor then returned to the scene of the fire, Hackney did not.

The defendant was questioned on the morning of the 14th by local police officials and the fire marshall. He told them that he and the victim had been together the previous two days, that they had gone to her house, that they had argued over his attention to another woman, and that she had asked him to leave. He said he had gone out to the car and had there fallen asleep. He told the police he awoke later and left the scene, and that there was "nothing wrong" when he left in his car. At the trial he told substantially the same story, except that he testified that when he awoke the house was completely engaged in flames and, seeing that there was no way to help Matheson, he left and drove home. He denied hitting the victim with anything.

The defendant's explanation of his conduct was severely impeached on cross-examination. Furthermore, two witnesses corroborated his testimony that he was with the victim shortly before her death. One of these witnesses had overheard Hackney make a phone call a day or two before, following which he announced, "Somebody is going to get killed."

The defendant's contention below was that evidence introduced by the State was not strong enough to meet the test required in a case involving wholly circumstantial evidence, i. e. that the proof did not exclude every other reasonable hypothesis except that of guilt. *Marable v. State*, 203 Tenn. 440, 313 S.W.2d 451 (1958). The defendant

concedes that on appeal he has the burden of showing that the evidence preponderates against the verdict and in favor of his innocence. See generally, *Farmer v. State,* 208 Tenn. 75, 343 S.W.2d 895 (1961); *Patterson v. State,* 4 Tenn.Cr.App. 657, 475 S.W.2d 201, 203 (1971); *Williams v. State,* 520 S.W.2d 371 (Tenn.Cr.App.1974).

Considered in its totality, the evidence in the record does not preponderate against the jury's verdict. The proof demonstrates that the defendant and the deceased had been involved in an ongoing argument, which may be taken as a motive for Hackney's behavior. Furthermore, he was present at the scene immediately before and at the time of Matheson's demise, giving him an opportunity to cause her death. His flight from the scene, his inconsistent statements following the event, and his apparent unconcern and lack of surprise or shock at the desperate plight of his lover all indicate a consciousness of guilt from which the jury could infer unlawful conduct on his part toward the deceased.

We are aware that none of these circumstances, when taken alone, would support a finding of guilt. But as this Court has observed in *Hicks v. State,* 490 S.W.2d 174, 178 (Tenn.Cr.App.1972):

In circumstantial evidence cases single facts of themselves may account each for little weight, but when all of the facts and circumstances are put together, they may unerringly point the finger of guilt to the defendant to the exclusion of all others beyond a reasonable doubt.

The jury heard the evidence in this case. They were in a far better position than we to weigh the credibility of the witnesses, especially the credibility of the defendant when he testified in his own behalf. We cannot say that the evidence before us preponderates against their final determination of the facts.

The judgment of the trial court is affirmed.

RUSSELL, Panel P. J., and GALBREATH, J., concur.