IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs January 7, 2003

## STATE OF TENNESSEE v. TOMMY LEE MIDGETT

**Direct Appeal from the Circuit Court for Madison County**
**No. 00-225     Donald H. Allen, Judge**

_____

**No. W2002-00295-CCA-R3-CD  - Filed July 24, 2003**

_____

The defendant was tried on two counts of first degree premeditated murder and convicted of two counts of facilitation of first degree murder for which he received consecutive twenty-four-year sentences.  In his appeal, he presents the following claims:  (1) the evidence was insufficient to support his convictions; (2) the trial court erred in excluding evidence of others having motives to kill the victims; (3) the State made an improper statement during its closing argument that constituted plain error; and (4) the trial court erred in sentencing.  Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOE G. RILEY and JOHN EVERETT WILLIAMS, JJ., joined.

Didi Christie, Brownsville, Tennessee (on appeal); George M. Googe, District Public Defender; and Vanessa D. King, Assistant District Public Defender (at trial), for the appellant, Tommy Lee Midgett.

Paul G. Summers, Attorney General and Reporter; David H. Findley, Assistant Attorney General; James G. Woodall, District Attorney General; and Shaun A. Brown and Stacy M. McEndree, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTS

The defendant was convicted of facilitation in the murders of Jasper Williams and James Hicks at Williams' residence in Jackson on October 14, 1999.

**State's Proof**

John Floyd testified that on October 14, 1999, he was a twelfth grade student at North Side High School in Jackson and had broken up a fight between the defendant, Tommy Lee Midgett, and Jasper "Lil' Pac-Man" Williams, one of the victims, on the school bus after school that day. According to Floyd, Williams initiated the fight. After the fight had ended, the defendant said "that he was going to set Lil' Pac-Man up." Because of this and other altercations, the bus was stopped and the police were called to the scene where they removed Floyd from the bus, because he was involved in another fight. According to his testimony, he got off the bus at the Boys & Girls Club. At school the following day, Floyd and the defendant "g[o]t into it" when the defendant told him, "Boy, come here. I want to tell you something. Go in that bathroom with me." Floyd refused to comply with the defendant's demands. On cross-examination, Floyd admitted that he had prior juvenile adjudications for burglary and theft.

Annette Davis, a bus driver for the Jackson-Madison County School System, testified about the fight that Floyd described. She said that she had to stop the bus she was driving on October 14, 1999, because of the fight in the back of the bus between Williams and the defendant. She described the fight:

> They were just holding one another . . . and I tried to get them to . . .
> let each other go, you know. But obviously, they didn't want to.
> They just had each other in . . . a hold, and they wouldn't release
> themselves. So, you know, I didn't know what else to do.

She then called her boss who notified the police. They arrived about ten minutes later, but did not remove either person from the bus. Davis resumed her route and when she dropped Williams off at his stop, the defendant also got off the bus, although that was not his usual stop. She said that when the defendant and Williams left the bus "they seemed like they was (sic) in good demeanor, you know, like there was just a spat or whatever that went on and . . . they had pretty much . . . was (sic) getting over it, you know, like it was no big deal or anything."

However, Davis said she did not recall John Floyd being on the bus, anyone trying to break up the fight, or any threats being made. Also, she did not remember any other fights on the bus that day. She said she did not speak to "an Investigator with the Police Department" or, specifically, "Investigator Jeff Austin" a few days after the incident. When shown a signed statement bearing her name, Davis said, "It looks like my signature," but "I don't remember signing this," and "[T]his is my first time of really seeing this."

Pamela Jones, the mother of Williams, said that the school bus was late dropping her son off on the afternoon of October 14. Looking for her son, she went to the school and learned that the bus had left the school on time. She returned home just after 3:00 p.m. and saw her son walking out the front door and the defendant sitting on the front porch. Williams went back into the house and the defendant left. Sometime after 8:30 p.m., Williams left to go to his sister's house and was told to

be home by 10:00 p.m. Jones spent the night next door at her boyfriend's house, going to bed "about 10:30" p.m. She returned to her house at 6:00 a.m. to wake up her son, as she did every morning. She noticed that a key was stuck in the front door, which was unlocked. Jones opened her son's bedroom door and saw him on his bed, with his friend, James "Little Head" Hicks, who had spent the night, nearby. Thinking they were still asleep, she said, "Get up, Pac. Y'all get up before you miss the bus," but received no response. Jones continued:

> Then I went over to the bed and I pulled him up like that (indicating), and a big puddle of blood came out of the back of his head. And Little Head was sitting on the couch straight up like that (indicating). And I went over there and touched him and he was real cold. And so, I ran out of the house and called the police.

Lola Williams, Williams' older sister, testified that Williams, along with James Hicks and Octavius Gatlin, came over to her house "around nine or 9:30" on the night of October 14. They stayed for "[a]bout thirty or forty-five minutes" and "talk[ed] to a preacher about the Bible" before leaving together.

Octavius Gatlin testified that, after he, James Hicks, and Jasper Williams went to Williams' sister's house on the evening of October 14, 1999, they walked to the front of her apartment complex to wait "on a ride for somebody to pick them up." An African-American man, driving "probably about a cream color" Cadillac, picked up the victims and gave them a ride. Gatlin did not go with them.

Carlos Henning testified that he had given Williams and another person a ride to Williams' house in his burgundy Buick LeSabre. When they arrived at Williams' house, the defendant and two others were standing in the front yard. Henning, who left after dropping off the victims, noticed that "everybody was shaking hands." On October 18, 1999, Henning identified the defendant from a photographic lineup as one of the people standing outside when he dropped the victims off at Williams' house. On cross-examination, Henning denied owning a cream-colored Cadillac and admitted having a 1997 conviction for theft of property under $500.

Officer John Hasz of the Jackson Police Department testified that he was dispatched to Jasper Williams' house at approximately 6:30 a.m. on October 15, 1999. When he arrived, Pamela Jones, who "seemed hysterical," was in the front yard. Noticing no signs of forcible entry, Hasz entered the house and observed "two black males, one lying on a mattress and another sitting . . . on a couch," both of whom were noticeably deceased due to the "large amount of blood" by each victim. He learned that the victims were Jasper Williams and James Hicks. He testified that the neck of Williams' T-shirt was unusually "stretched out."

Investigator Jeff Austin of the Jackson Police Department testified that he interviewed Annette Davis on October 19 about the altercation that occurred on her bus on October 14. He identified a signed statement made by Davis in which she said that she "saw Jasper Williams, John

Floyd, and [the defendant] laying [sic] over the seat. They had 'hold of each other." Her statement further acknowledged that "John Floyd got off at the Boy's and Girl's Club."

Austin testified that the defendant was taken into custody, waived his <u>Miranda</u> rights, and gave a statement. As to his scuffle with Williams on the bus, the defendant said that when they got off the bus together, he "thought everything was cool. We got everything straight." The defendant told Austin that, on the night of the murders, he and his girlfriend returned home from the store "about 6:40 p.m.," and he then "stayed home the rest of the night" until 5:45 a.m. the next morning when he left to meet his girlfriend. During the making of the statement, the defendant became upset, "[t]ears started to come down his face," and he told Austin that he "needed to start over." The defendant gave a complicated explanation of his activities the night the two victims were killed, implicating a Sherrod Manuel in the shootings:

> Sherrod Manuel drove up in a four-door maroon car with a donut tire. The car was driving [sic] by a black male named Schooder. Sherrod asked me if I had a cigarette, and I told him no. I asked them what they were doing, and they told me they were just riding around. Schooder asked me if I wanted to ride. I got into the car and left with them. It was about 9:45 p.m. when I got into the car. We rode around Lincoln Courts and Hillcrest Circle. We was [sic] going to go to Old Hickory when Schooder said that we needed to go ahead and take care of this business. I asked Schooder, "What are you going to do?" And he told me he was going to drop Sherrod off at a one-way. He drove to Pac-Man's house and dropped Sherrod and me off. He drove the car to Hays and took a right like you were going to the store. Sherrod told me to chill across the street. Sherrod knocked on the door, and somebody let him in. He was in the house five or ten minutes. It was about ten when he went into the house. The door was open, and I could see mattresses on the floor and someone was sitting on it. Sherrod walked to the right. After the five or ten minutes there that he was in the house, I heard two shots. I turned and ran up the street behind some tennis courts and ran more when I looked back and saw Sherrod running up the street. He had black pants, black shoes with red and white strings, and a red shirt and a black and red pullover jacket on. When I saw him, I waited on him. I asked him what happened. He told me that the pistol dropped and it hit him. He told me to come on and . . . get the car. We saw the car, and Schooder was sitting on the back of it. When he saw us coming, he started the car and met us. When we got in the car, I asked Sherrod if Pac had a gun. He told me no. He said that he had a .32 or a .38. I can't remember which one he said. They turned the music up, and they dropped me off on Tomlin Street. Schooder told

me that they had to go take care of some business. I got home at about 11:35 p.m.

Austin said that he had "released nothing" to the media regarding the details of the shootings, and that both Manuel and Schooder, whose real name is Christopher Hardy, were taken into custody based on the defendant's statement, but no charges were brought against either.

Sherrod Manuel said that, on October 14, he was at home with his mother from approximately 7:30 p.m. until the following morning. He was friends with Christopher Hardy from school and knew him to drive either a light blue or gray car, but never a burgundy car. He denied being with the defendant on the evening of October 14.

Special Agent Shelly Betts, a Tennessee Bureau of Investigation ("TBI") forensic scientist, testified that the slugs taken from the victims were of a ".38 Special or a .357 Magnum caliber" and, in her opinion, fired from the same weapon. Because a possible murder weapon was not recovered, she did not attempt to match the slugs to a particular pistol.

Reggie Lowry, the Madison County Assistant Medical Examiner, testified that he was called to the crime scene on October 15, 1999, arriving at 8:00 a.m. In the front room of the residence, he observed Williams' body on a mattress on the floor and Hicks's body reclined on a couch. Williams had a gunshot wound above his left ear, and Hicks had a gunshot wound "just over his right eye at his hairline." Both victims' bodies were taken to the medical examiner's room at a local hospital and then sent to Memphis that same day for autopsies.

Dr. O'Brien Cleary Smith, the Shelby County Medical Examiner, testified that he performed autopsies on the victims on October 15, 1999. He determined that Williams died as a result of a single gunshot wound to the head, and Hicks died from a "near gunshot wound to the head," each shot instantly incapacitating the victims and rendering them incapable of voluntary movement. As to Williams' wound, Dr. Smith testified that he found no powder burns. Thus, the distance between the barrel of the gun and Williams' head was either more than twenty-four inches or there was an intermediate object which absorbed the powder burns but not the bullet. The distance between the barrel of the gun and Hicks's head was probably between six and twenty-four inches. According to Dr. Smith, a gunman standing between the two victims while shooting, not a dropped gun discharging, was "one scenario amongst many that [could] explain the anatomic findings at autopsy of how the bullets went through each [victim's] head." Drug screens revealed the presence of cocaine and marijuana in both victims.

Mike Turner, a crime scene investigator and evidence custodian with the Jackson Police Department, testified that he went to the crime scene to take photographs on October 15, 1999, around 7:45 a.m. The house was a duplex, and the bodies of the victims were in the living room, one on a mattress on the floor next to a couch and the other seated on the couch with his feet propped on the mattress. Turner said that the blinds on both windows were closed, the only light in the room

was from a lamp in the corner, and the room was "very dim. It was hard to see in there. We used flashlights quite a bit to take a closer look at things."

Turner testified that he again went to Williams' house the night of May 19, 2001, "[t]o see what was visible from the street through the front door" in order to determine whether it was possible to see inside the house as the defendant said he had done. Standing across the street and at the curb directly in front of the house, Turner took photographs, sixteen of which were admitted into evidence, in which the lighting conditions and the position of the front doors were varied. Under none of the circumstances was he able to see inside the house, as the defendant claimed he had done.

### Defense Proof

Violent Crimes Investigator Cathy Ferguson of the Jackson Police Department testified that she collected evidence at the crime scene, including "two baggies of marijuana seeds," "three small marijuana roaches," and four bags of what appeared to be crack cocaine. Additionally, "[e]ight to ten" slips of paper with "names and phone numbers" were collected.

TBI Special Agent Forensic Scientist Lisa Mays said she examined the bags of evidence received from Investigator Ferguson, and the only controlled substance she found was marijuana. The bags originally thought to contain cocaine tested negative for any controlled substances.

Investigator Jeff Austin was recalled by the defendant and testified that "[t]here is a group called the Hoover Crips that use the [number] 107 as a symbol." Earlier, during cross-examination, Dr. Smith, who performed the autopsies on the victims, had testified that Williams had a tattoo on his upper arm that possibly could be described as the number "107."

### ANALYSIS

### I. Sufficiency of the Evidence

The defendant argues that the evidence at trial was circumstantial and insufficient to support his convictions of facilitation of first degree murder.

When the sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560, 573 (1979); see also State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992); Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987).

"A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

In State v. Reid, 91 S.W.3d 247, 277 (Tenn. 2002), petition for cert. filed (U.S. Apr. 11, 2003), our supreme court restated the holding of State v. Smith, 868 S.W.2d 561, 569 (Tenn. 1993), which cited State v. Duncan, 698 S.W.2d 63, 67 (Tenn. 1985), that "[a] conviction may be based entirely on circumstantial evidence where the facts are 'so clearly interwoven and connected that the finger of guilt is pointed unerringly at the Defendant and the Defendant alone.'" We now will determine whether the evidence in this case was sufficient to support the defendant's convictions for facilitation of first degree murder.

First degree murder is the "premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). Facilitation is established by proof that the accused knew another person intended to commit a specific felony and knowingly furnished substantial assistance in the commission of the felony. Id. § 39-11-403(a). Therefore, the State was required to prove the commission of a specified felony and the assistance the defendant gave to the person committing the specified felony. State v. Parker, 932 S.W.2d 945, 950-51 (Tenn. Crim. App. 1996).

Here, the evidence viewed in the light most favorable to the State established that the defendant got into a fight with Jasper Williams on the afternoon of the murders, saying afterwards "that he was going to set [Williams] up." The defendant got off the bus at Williams' stop instead of his own. Later that night, he was seen with two other men in front of Williams' house as Williams arrived home. The next morning, Williams and James Hicks were found dead, each from a single gunshot wound to the head and both bullets coming from the same pistol. The defendant gave a statement to the police in which he initially denied any knowledge of the murders before becoming emotional, stating that he needed to "start over," and then giving a second, different statement, in which he claimed he was "riding around" with Sherrod Manuel and Christopher "Schooder" Hardy in a maroon car on the night of the murders. Neither Manuel nor Hardy had access to a maroon car, and Manuel, whom the police did not charge, denied the defendant's claim, saying that he was at home all night. Investigator Turner testified that at the point across the street from which the defendant claimed to have seen the interior of Williams' house and the position of one of the bodies, such a view was not possible. Because no details of the crime had been made public, the defendant's information that there were only two gunshots and one of the victims was on the mattress could only be known by someone present inside the house where the bodies were found. Inconsistent statements following the event indicate a "consciousness of guilt from which the jury could infer unlawful conduct." Hackney v. State, 551 S.W.2d 335, 339 (Tenn. Crim. App. 1977). Accordingly, we conclude that the evidence was sufficient to support both of the convictions.

## II. Admissibility of Motive Evidence

The defendant contends additionally that the trial court improperly excluded "certain letters found in the home of Jasper Williams and a green notebook containing gang insignia." According to the defendant, these would have "tended to prove it was likely the deaths of the victims were related to a vengeful lover or lovers or were related to gang activity."

Tennessee Rule of Appellate Procedure 27(a)(7) requires the defendant to make appropriate references to the record in the argument section of his brief and to cite relevant authority in support of the contentions therein. Moreover, "[i]f reference is made to evidence, the admissibility of which is in controversy, reference shall be made to the pages in the record at which the evidence was identified, offered, and received or rejected." Tenn. R. App. P. 27(g). Failure to do so will ordinarily constitute a waiver of the issue. State v. Schaller, 975 S.W.2d 313, 318 (Tenn. Crim. App. 1997). No references are made to testimony about these letters or the notebook, nor are they identified by exhibit number. Accordingly, we conclude that this issue is waived. Even if not waived, the claim would be without merit, as we will explain.

Our review of the record on appeal shows that, during the trial, the defense advised the trial court that "several letters . . . from various females," as well as a letter from Williams to a female, were found at Williams' residence. Asked by the court to explain the relevance of these letters to the crimes, counsel stated, "[T]he relevance is that there was not just one letter from one significant other – that there were several letters from various girls, and maybe one was jealous enough to do something about it." As for the green notebook, defense counsel said that it was found inside Hicks's book bag at Williams' residence. The court described this notebook as "all empty pages except the very first page has some writing in pencil." The defense contended that this writing was a "gang tag," and that "as a gang member . . . there would be another motive for the murder of both [victims]." Defense counsel gave a negative response when asked by the trial court if the defendant had "any witnesses at all that are going to say that this shooting incident was somehow gang related or that it was somehow related because of some jealous girlfriend or friend." After reviewing the letters, the court determined that they were irrelevant, explaining that "there's nothing about these letters that would indicate any kind of jealously or hatred toward [the victims]." Likewise, the court determined that the green notebook was irrelevant, explaining that there was no proof as to who had made the notations in Hicks's notebook, that he was a gang member, or that the killings were in any way gang related. The record on appeal fully supports these determinations. Additionally, we note that the defense was allowed to present proof of marijuana, fake crack cocaine, and slips of papers bearing names and numbers found at the Williams residence, as well as a possible gang tattoo on Williams' body. During final argument, the defense pointed to the items, saying as to the fake drugs and slips of paper, "It sounds like a drug dealer or somebody posing as if they're selling drugs." Additionally, the defense argued, "Other reasonable hypotheses for the death of these two young men. Obvious gang connections. And it could be retribution for purchasing some of those fake drugs. It could be. We don't know." In fact, the defense was allowed to put alternative theories before the jury. Thus, even if this issue had not been waived, we would conclude that it is without merit.

### III.  Closing Argument

The defendant claims that the State made an improper statement during the rebuttal portion of its closing argument that constituted plain error.

Before the State's rebuttal, however, defense counsel, in closing argument, attempted to characterize the State's case against the defendant and stated, "What the State has done – it has put on the defendant's statement and said, 'No.  Don't believe that.  He's a liar.'"  Because no such remarks were made as part of the State's initial closing argument, defense counsel was actually the first to utilize the word "liar."  During rebuttal, the State, making reference to the defendant's claim that he could see inside the victim's house from across the street, remarked, "We know that's not true.  We know that's a lie."  Then, referring to the defendant's inconsistent statements, the State commented that the defendant "lied to you through his statement about where he was and what he did . . . lied to you about what he could or could not see[.]"  Defense counsel made no contemporaneous objections to any of the remarks made by the State during closing arguments.

Tennessee courts "have traditionally provided counsel with a wide latitude of discretion in the content of their final argument" and trial judges with "wide discretion in control of the argument."  State v. Zirkle, 910 S.W.2d 874, 888 (Tenn. Crim. App. 1995).  However, it is preferable for counsel in criminal cases to limit their commentary to the facts and circumstances of each case.  Id.  "The general test to be applied is whether the improper conduct could have affected the verdict to the prejudice of the defendant."  Harrington v. State, 385 S.W.2d 758, 759 (Tenn. 1965).  The defendant has made no such showing and we cannot say that the State's three comments, viewed in the context of the entire closing argument, are so inflammatory that they affected the verdict.

In any event, the failure to object contemporaneously to testimony in this case constitutes a waiver.  See Tenn. R. App. P. 36(a), Advisory Commission Cmts. ("The last sentence of this rule is a statement of the accepted principle that a party is not entitled to relief if the party invited error, waived an error, or failed to take whatever steps were reasonably available to cure an error."); State v. Smith, 24 S.W.3d 274, 279-80 (Tenn. 2000); see also Hill v. State, 513 S.W.2d 142, 143 (Tenn. Crim. App. 1974) (stating that to allow evidentiary questions to be raised at anytime would "undercut the very function of the trial process, for it would become a tactical matter of defense to allow a bit of constitutionally inadmissable evidence into the record, in the hope for an acquittal but secure in the knowledge that a new trial would result").  Here, the defendant failed to object to the comments he now challenges on appeal.  Accordingly, this issue is waived.

### IV.  Sentencing

The defendant argues that the trial court improperly imposed consecutive twenty-four-year sentences.  Specifically, he challenges the trial court's application of sentencing factors.

## A. Standard of Review

When an accused challenges the length and manner of service of a sentence, it is the duty of this court to conduct a *de novo* review on the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The presumption does not apply to the legal conclusions reached by the trial court in sentencing the accused or to the determinations made by the trial court which are predicated upon uncontroverted facts. State v. Butler, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); State v. Smith, 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994); State v. Bonestel, 871 S.W.2d 163, 166 (Tenn. Crim. App. 1993), overruled on other grounds by State v. Hooper, 29 S.W.3d 1, 9 (Tenn. 2000). However, this court is required to give great weight to the trial court's determination of controverted facts as the trial court's determination of these facts is predicated upon the witnesses' demeanor and appearance when testifying.

In conducting a *de novo* review of a sentence, this court must consider (a) any evidence received at the trial and/or sentencing hearing, (b) the presentence report, (c) the principles of sentencing, (d) the arguments of counsel relative to sentencing alternatives, (e) the nature and characteristics of the offense, (f) any mitigating or enhancement factors, (g) any statements made by the accused in his own behalf, and (h) the accused's potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-103, -210; State v. Scott, 735 S.W.2d 825, 829 (Tenn. Crim. App. 1987).

The party challenging the sentences imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401, Sentencing Commission Cmts.; Ashby, 823 S.W.2d at 169. In this case, the defendant has the burden of illustrating the sentence imposed by the trial court is erroneous.

## B. Length of Sentence

In sentencing the defendant, the trial court applied the following enhancement factors:

> (1)   The defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range;
>
> (2)   The defendant was a leader in the commission of an offense involving two (2) or more criminal actors;
>
> (8)   The defendant has a previous history of unwillingness to comply with the conditions of a sentence involving release in the community; and

(20) The defendant was adjudicated to have committed a delinquent act or acts as a juvenile that would constitute a felony if committed by an adult.

See Tenn. Code Ann. § 40-35-114(1), (2), (8), (20) (1997).  Factors (1), (8), and (20) were given "great weight."  Based on these factors, the trial court imposed sentences of twenty-four years for each count of facilitation of first degree murder.

The trial court found the following two mitigating factors applicable:

(6) The defendant, because of youth or old age, lacked substantial judgment in committing the offense; and

(8) The defendant was suffering from a mental or physical condition that significantly reduced the defendant's culpability for the offense.

See Tenn. Code Ann. § 40-35-113(6), (8) (1997).  The trial court afforded the mitigating factors "very little weight."  The application of factor (8) was based on a finding that the defendant was "at the mildly retarded to borderline range of intellectual functioning at the time of the crime," as well as suffering from "chronic Attention Deficit Hyperactivity Disorder which did significantly reduce his ability to utilize substantial judgment."

There is no mathematical formula of evaluating the enhancement factors to calculate the appropriate sentence.  See generally State v. Boggs, 932 S.W.2d 467, 475 (Tenn. Crim. App. 1996).  "Rather, the weight to be afforded an existing factor is left to the trial court's discretion so long as the court complies with the purposes and principles of the 1989 Sentencing Act and its findings are adequately supported by the record."  Id. at 475-76 (citations omitted).

At the defendant's sentencing hearing, the trial court relied on his juvenile adjudications in the application of enhancement factor (1).  Juvenile court orders show that he was found to have committed aggravated assault, aggravated burglary, and theft of property over $1000, all of which were relied upon at sentencing.  In State v. Jackson, 60 S.W.3d 738, 742 (Tenn. 2001), our supreme court held that enhancement factors (1) and (20) are mutually exclusive and, therefore, factor (1) must necessarily apply only to adult criminal conduct and factor (20) must apply exclusively to juvenile adjudications of delinquent acts.  On appeal, the State concedes that the trial court should not have relied on these juvenile adjudications in support of application of factor (1).  We agree that these convictions do not support application of enhancement factor (1), but they do support factor (20), as the trial court found.  See Tenn. Code Ann. § 40-35-114(20) (1997).

-11-

Additionally, we cannot conclude that there was evidence to support the application of enhancement factor (2), that the defendant was a leader in the commission of an offense involving two (2) or more criminal actors. See id. § 40-35-114(2) (1997).

However, factor (8) was correctly applied. The defendant had a previous history of unwillingness to comply with the conditions of a sentence involving release in the community, see id. § 40-35-114(8), demonstrated by his failure to abide by the conditions of his probation.

The mere number of existing enhancement factors is not relevant as the important consideration is the weight to be given each factor. State v. Hayes, 899 S.W.2d 175, 186 (Tenn. Crim. App. 1995). We conclude, upon *de novo* review, that the defendant's sentences are not excessive and are "the least severe measure necessary to achieve the purposes for which the sentence is imposed." Tenn. Code Ann. § 40-35-103(4). This issue is without merit.

### C. Consecutive Sentencing

In ordering consecutive sentencing, the trial court stated:

> The Court is going to order that he serve these twenty-four year sentences consecutively, which will mean he'll have a forty-eight year sentence to serve as a Range 1 Offender.
>
> Now, The Court does want to make sure it's clear that this forty-eight year sentence is being done in order to protect the public from [the defendant's] future criminal conduct because there's no doubt in my mind that if he ever got released on probation in the next few years that he would go out and commit criminal conduct again. His history indicates that.
>
> And, again, The Court feels like any chance of rehabilitation, he's already lost that. I just don't – at this point, I don't see that [the defendant] would ever be rehabilitated by any other alternative type program. So, The Court is going to sentence him to serve these in the Tennessee Department of Corrections. Of course, obviously, he's not eligible for probation. He's not eligible for any type of alternative sentencing. So, he is sentenced to the Tennessee Department of Corrections.
>
> I do want to state, too, that part of the circumstances The Court is considering in ordering consecutive sentencing is that in The Court's opinion this was an execution type murder. No question about it. These two young men, based upon the facts and circumstances, came home that night. There were some people there

waiting – [the defendant] and perhaps two of his friends, from the proof, and that these two individuals were forced into that residence. One was told to sit down on the couch. One was told to sit down on the mattress. And at some point thereafter, . . . this one gun was used to shoot and kill both of them. There's just no question that this was an execution type murder. And because of that, that's the reason The Court feels like a forty-eight year sentence is appropriate under the circumstances that were presented at trial and also testified by all the witnesses.

The trial court found the following consecutive sentencing criteria applicable:

> (2)     The defendant is an offender whose record of criminal activity is extensive;
>
> (4)     The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high; and
>
> (6)     The defendant is sentenced for an offense committed while on probation.

Tenn. Code Ann. § 40-35-115(b)(2), (4), (6). As a general rule, consecutive sentences are imposed at the discretion of the trial court upon its consideration of one or more of the above statutory criteria. These criteria are stated in the alternative; therefore, only one need exist to support the appropriateness of consecutive sentencing. The trial court found criteria (2), (4), and (6) applied.

The defendant argues that "the court took great pains to state that the defendant was a violent offender from whom the public should be protected. However, there was inadequate proof in the record to support this position[.]" Assuming *arguendo* that this assertion is correct and criterion (4) was erroneously considered, the defendant's argument still must fail because the application of criteria (2) and (6) is supported by the record.

## CONCLUSION

Based on the foregoing authorities and reasoning, the defendant's convictions and sentences for facilitation of first degree murder are affirmed.

_____
ALAN E. GLENN, JUDGE

-13-